Docket No. 94677–Agenda 15–March 2003.

In re
 MARRIAGE OF SORYIA COLLINGBOURNE, Appellant, and GEOFF B. COLLINGBOURNE, Appellee.

Opinion filed May 22, 2003.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

Soryia Collingbourne, the custodial parent of the parties’ minor son Tyler, filed a petition in the circuit court of Kane County for leave to remove Tyler from the State of Illinois to Massachusetts. The circuit court granted the petition for removal, finding that the best interests of Tyler would be served by allowing him to move to Massachusetts with his mother. A majority of the appellate court reversed, holding that the circuit court’s decision to grant the petition for removal was against the manifest weight of the evidence. 332 Ill. App. 3d 665. For the reasons that follow, we reverse the judgment of the appellate court.

BACKGROUND

Soryia and Geoff Collingbourne were married on June 13, 1985. As a result of the marriage, two children were born to the parties: Geoffrey, born January 11, 1986, and Tyler, born January 10, 1991. The parties’ marriage was dissolved on September 1, 1999. The judgment for dissolution of marriage incorporated a marital settlement agreement, which provided that although Soryia and Geoff were to have joint custody of the children, Soryia was awarded sole physical custody of Tyler, and Geoff was awarded sole physical custody of Geoffrey. The marital settlement agreement also incorporated a joint parenting agreement. The joint parenting agreement reiterated that although the parties were awarded joint custody of both children, the physical custody of the children was split between the parents. The joint parenting agreement specifically provided that both parties were to have equal rights and responsibilities for the major decisions in connection with the education, recreation, health care and religious training of the children. However, the agreement left day-to-day decisions with respect to the children within the sole discretion of the custodial parent. The joint parenting agreement also set forth the visitation schedule between the parents and the children. Each parent was to have both children every other weekend, and the parties agreed to have the children on alternate holidays. The agreement also allowed additional visitation, as authorized.

On June 15, 2001, Soryia petitioned the circuit court of Kane County for the removal of Tyler, then 10 years of age, from Illinois to the State of Massachusetts. In her petition, Soryia alleged that she had become engaged to Mark Rothman, who resided in Sharon, Massachusetts. For the past 11 years, Mark had owned and operated his own business in Sharon, Mark Rothman & Associates, and his business prevented him from relocating from that geographic area. Soryia also alleged in her petition that upon moving to Sharon, she would become an employee of Mark’s business, earn an annual base salary of $75,000, and, due to a series of incentives, had the potential to increase her income up to $100,000 per year. Soryia stated that she was currently employed by PetAg, Inc., with a base annual salary of $50,000. Soryia alleged, however, that her employment with PetAg was “in jeopardy due to the company’s severe financial difficulties.” Soryia stated that PetAg plant workers “have had their pay cut up to 50%,” and that because “[c]ompany bonuses have been terminated due to said financial problems,” she did not receive her quarterly financial bonus.

Soryia further alleged in the petition that, in addition to the better financial opportunity that the move to Massachusetts would provide, she would also not be required to travel on overnight business trips, as she was frequently required to do as part of her employment with PetAg. Soryia also stated that in her new position she could structure her work hours so that she could be home with Tyler before and after school. Soryia contrasted this with her current work arrangement, which required Tyler to spend one hour in the morning and two hours after school in day care. During the summer months, Tyler’s time in day care increased to nine hours per day, coinciding with Soryia’s work schedule. Soryia alleged that Tyler “expressed his displeasure” with this situation.

In addition, Soryia alleged that under her current work arrangement, it was difficult for Tyler to engage in extracurricular activities. According to Soryia, if she and Tyler were allowed to move to Massachusetts, Tyler could become involved in many extracurricular activities, including sports, music, theater, and dance. Soryia also alleged that Tyler would reap an academic benefit from the move, based upon her opinion that the Sharon school district was “significantly better” than the Hampshire school district in which Tyler was currently enrolled.

Soryia further alleged in the petition that Tyler’s residence and community would be enhanced, as the move would allow Tyler to live in a three-bedroom, 3,000 square foot home, surrounded by woods. At the time Soryia filed the petition, she and Tyler were living in a two-bedroom apartment in Huntley, which afforded Tyler with limited access to children of his own age.

Soryia also alleged in the petition that Geoff “has not actively participated” in Tyler’s day-to-day life, and that on numerous occasions Geoff has worked on Saturdays rather than spend his entire scheduled visitation time with Tyler.

In sum, Soryia alleged that as a result of the financial and other opportunities offered by the move, the quality of both her and Tyler’s lives would be significantly enhanced. Soryia alleged that bettering the quality of life for both herself and Tyler was the only motive for her move. As evidence of her good faith, Soryia proposed a visitation schedule that would provide Geoff with more time with Tyler than he had under the existing visitation arrangement, with visitation periods of an extended duration. With respect to visitation between Tyler and his brother Geoffrey, Soryia noted that Geoffrey was nearly 16 years old and that he and Tyler did not share many of the same interests and did not spend a substantial amount of time together. Nevertheless, under the proposed visitation schedule, Soryia asserted, they would also have an increased amount of visitation time together.

 On July 12, 2001, Geoff filed his answer to Soryia’s removal petition. Geoff denied that he was not actively involved in Tyler’s life, and also denied that he chose to work on Saturday rather than spend scheduled visitation time with Tyler. Geoff did admit, however, that due to his profession as an electrician, he sometimes had to work on Saturday mornings during the summer, and that this conflicted with the scheduled visitation.

It was Geoff’s position that Soryia was seeking to improve only the quality of her own life, and that Tyler’s quality of life would be adversely affected if Tyler were separated from his father, brother, extended family, friends, and the community in which he had been raised. Geoff also stated that both his fiancee, Carol Lynn, and his sister, Lori Price, had offered to provide occasional day care for Tyler. In addition, Geoff observed that the Hampshire park district could provide Tyler with the opportunity for several extracurricular or after-school activities. Geoff maintained that Soryia’s proposed visitation schedule would deny him ongoing contact with Tyler, and would deny Tyler contact with his brother. Geoff maintained that his objections to Tyler’s removal were in the child’s best interests, and requested that the court deny the removal petition. Geoff further stated that if Soryia chose to move to Massachusetts without Tyler, Tyler’s physical custody should be transferred to him and a visitation schedule between Tyler and his mother should be entered.

The circuit court held a hearing on Soryia’s petition over several days during the month of August 2001. Soryia testified that she is employed as a national sales manager by PetAg, Inc., which is located in Hampshire. Soryia earned an annual base pay of $50,000, which, in the past, had been increased by quarterly bonuses pegged to the company’s profits. For example, in the year 2000, Soryia earned a $6,000 bonus. However, because the company has experienced financial difficulties, no bonuses were paid in 2001. According to Soryia, her job routinely required her to travel on overnight business trips. However, due to the company’s financial problems, her travel had decreased. As examples of the company’s financial problems, Soryia stated that the corporate credit card that employees used to cover travel expenses was discontinued due to nonpayment, merchandise vendors required that the company pay up front for purchases, and some plant workers experienced a 50% cut in pay. Soryia stated that in an attempt to seek other employment she had placed her resume on a web site. However, she also admitted that she did nothing else to seek other employment in this geographic area.

Soryia testified that she resided with Tyler in a two-bedroom apartment in Huntley, and that Geoff lived with Geoffrey in a single-family home in nearby Hampshire. According to Soryia, upon the dissolution of their marriage the parties agreed to split the physical custody of the boys because Geoffrey is very active in the community and in sports, and has had a very close relationship with his father. Soryia testified that she had exercised all of her visitation with Geoffrey, but, that due to work commitments, Geoff had missed a portion of between 15 and 20 Saturdays of his visitation with Tyler in the year 2000. Soryia further stated that Geoff’s visitation with Tyler was otherwise consistent, and that the parties often spent time with the children during the weekdays that was in addition to that set forth in the joint parenting agreement. Soryia testified that under the agreement, Geoff would care for Tyler when her employment required her to make overnight business trips, which averaged about two times per month. In September 2000, however, Geoff accepted a new job that required him to leave home very early in the morning. Because she did not want Tyler to get up so early and be dropped off at day care for several hours before school started, Soryia hired a baby-sitter to stay with Tyler in their apartment on the nights that she traveled, and to then take him to school in the morning. According to Soryia, Geoff did not object to this arrangement.

Soryia testified that she believes that Tyler’s relationship with his father is “very important,” and that she has strived to further this relationship, as well as Tyler’s relationship with Geoff’s extended family. For example, Soryia stated that it was a tradition that the children spend holidays and family events with Geoff’s family, and that if those occasions fell on her scheduled weekends, she would nevertheless allow the children to stay with Geoff. Soryia stressed that she does not want to limit Geoff’s access to Tyler.

With respect to Tyler’s extracurricular activities, Soryia explained that although Tyler’s school day ended at 2:30 p.m., it was difficult for him to become involved in extracurricular programs offered by the school or the Huntley or Hampshire park districts because most programs ended in the early afternoon and required that a parent pick up the child at that time. Because Soryia’s work day extended until 5 p.m., she was unable to accommodate this time schedule. As another result of Soryia’s work schedule, Tyler had to attend day care for an hour in the morning before school and for approximately two to three hours after school. Soryia testified that it was only after she picked up Tyler from day care that a period of time commenced within which Tyler would do homework, go to the park, or participate in other activities in which he was interested. For example, in the previous fall Soryia was able to enroll Tyler in a dance program that held classes in the evening. Tyler apparently enjoyed the program, and Geoff attended the dance recitals. Soryia also testified that Tyler had not participated in any extracurricular activities over the summer because he had to attend day care during the hours that she worked. According to Soryia, Tyler is unhappy in day care.

Soryia stated that on one occasion, after the removal petition had been filed, Tyler told her that Geoff’s sister, Lori Price, had offered to watch him periodically so that he did not have to go to the day care center every day. Soryia stated that she did not speak with Lori, and that she told Tyler that discussions about his care were between her and his father. Soryia further testified that on a different occasion Tyler informed her that Geoff’s new wife, Carol Lynn, had also offered to provide some child care. Soryia testified that she thought it was “inappropriate” for these offers to be relayed through Tyler, and that they should be discussed between the parties. Soryia stated that she did not accept the offer.

With respect to Tyler’s education, Soryia stated that Tyler attends Hampshire Elementary School and had just completed the fourth grade. According to Soryia, in the past year Geoff had not attended Tyler’s parent-teacher conferences and rarely attended activities at Tyler’s school. Soryia confirmed that Geoff occasionally attended such events in the past. Soryia stated that although the Hampshire schools, in her opinion, are “adequate,” she believed that Tyler would receive a better education in Sharon, Massachusetts. Soryia testified that as part of her research into the Sharon school system, she reviewed statistics which she purchased over the Internet, contacted the Sharon schools, and spoke with the Sharon school superintendent. Based upon her research, Soryia was of the opinion that the Sharon school district could offer Tyler not only a superior education, but also greater opportunities for extracurricular activities. Soryia explained that, based upon her research, she believed that the ACT and SAT scores earned by Sharon students were higher than those of students in Hampshire, that the student-teacher ratio in the Sharon schools is lower than that in Hampshire, and that the percentage of Sharon students who go on to attend a four-year college is higher than in Hampshire. Soryia stated that these facts were very important to her, as her ultimate goal is that Tyler attend college. In addition, Soryia stated that the Sharon school system has an after-school “community enrichment” program where students are transported from the school to various sites to engage in activities such as videomaking, horseback riding, and cooking. Further, if Tyler were allowed to move, Soryia stated, the school he would attend is located seven minutes from Mark’s home. Tyler could take the bus, or Soryia could drive or walk him there.

Soryia also testified that although Tyler is still in elementary school, his brother Geoffrey attends high school. Because Tyler and his brother have a five-year age difference, they also have different interests. According to Soryia, Geoffrey is very active in soccer, and has played both on local teams and on teams which have traveled to soccer meets in different cities and states over the weekends. Soryia described the relationship between Tyler and Geoffrey as a “love-hate relationship.”

Soryia further testified that she became engaged to Mark Rothman earlier in the year, after a relationship of about 1½ years. Mark resides in Sharon and, for the past 11 years, has owned and operated his own business, Mark Rothman & Associates. Soryia stated that Mark is a manufacturer’s representative for various companies involved in the pet supply and home decor field, and that his territory is the New England area exclusively. According to Soryia, she and Mark discussed the possibility of his moving to Illinois and concluded that it would be impossible because of the business. Mark offered to employ Soryia in his business in a position similar to her position at PetAg, but at an increased annual salary of $75,000. The hours of the job would be structured so that she would work only during Tyler’s school hours and be at home with him when he returned. Soryia stated that the offices for the business are in Mark’s home, which has three bedrooms and is located on 1.5 acres, with a large yard in a wooded area. According to Soryia, the home is approximately 30 minutes from the Boston, Massachusetts, and the Providence, Rhode Island, metropolitan areas. Soryia testified that she and Mark had not yet set a wedding date because she could not move to Sharon without the court’s permission to take Tyler with her.

Soryia stated that she met with Geoff on three occasions to speak with him about the enhanced opportunities offered by the move to her and Tyler, and to attempt to arrive at an understanding. Soryia further stated that she had also discussed a proposed visitation schedule with Geoff, and had emphasized to him that she would do whatever it would take to make the move work for everyone involved. According to Soryia, the proposed visitation would be at least as extensive as presently exists.

Soryia testified that she proposed that Tyler would visit with Geoff for 8 to 10 weeks during the summer, and for one week each in February and April to coincide with two vacation breaks given by the Sharon school system. In addition, Geoff would have Tyler for long holiday weekends such as Memorial Day, Labor Day, and Columbus Day, as well as for Thanksgiving and Christmas break. Soryia stated that she wanted to continue the tradition of having Tyler spend the holidays with Geoff and Geoff’s extended family in Illinois. Soryia testified that she would accompany Tyler on the trips to Illinois until he got older, and that she would pay for all transportation costs. Soryia estimated that, depending upon traffic and other factors, the trip each way would take between 3 and 5 ½ hours. She also stated that she had no objection to Geoff’s coming to Sharon to visit with Tyler. Soryia also testified that she would promote, at her expense, frequent phone calls and e-mails between Tyler and Geoff, and that she would also provide Geoff with information concerning Tyler’s school events. Soryia stated that Tyler and Mark interacted “very nicely” together, but that she had no intent that Mark replace Geoff as Tyler’s father. On cross-examination, Soryia stated that she did not believe that Tyler’s travel between Sharon and Hampshire would interfere with any extracurricular activities in which Tyler may wish to participate.

The next witness to testify was Mark Rothman, Soryia’s fiancee. Mark stated that he has lived in Massachusetts his entire life, and in Sharon for the past five years. He stated that he is self-employed as a manufacturer’s representative in the consumer products industry, and that his sales territory is exclusive to New England. Although he has owned his own business for 11 years, Mark testified, his business is based upon 22 years of relationships and contacts in the New England area, and, if he were to move, he would have to completely start over in another area without the benefit of such business connections. Therefore, Mark testified, he is unable to move to Illinois.

According to Mark, his business has doubled in size over the past four to five years, and he has had trouble finding the right people to help him grow the business. He stated that he discussed with Soryia that if they were to get married and live in Sharon, Soryia would be given the responsibility of running the pet supplies division, at an annual base salary of $75,000 plus incentives. According to Mark, Soryia would have no overnight business trips, she would work out of their home, and she would be able to structure her own work hours.

Mark further testified that he gets along well with Tyler, and that Tyler has traveled to Sharon on numerous occasions. During those trips, Tyler visited museums and other historic and cultural sites in Boston and Providence. Mark has also spent a great deal of time with Tyler during Mark’s visits to Illinois. Mark stated that his home is located in a subdivision that has many children in Tyler’s age group, and described Sharon as an upscale suburban community where “the education system is its highest priority.” Mark testified that he personally visited the school that Tyler would be attending in Sharon, and also met with some of the teachers as well as the superintendent. According to Mark, the school recently added millions of dollars of physical improvements, including a new computer lab and gymnasium.

Mark stated that he would actively promote the relationship between Tyler and Geoff. Mark related that he and his own father are “the best of friends” and that he therefore understands the value of a close relationship between a father and a son. Mark testified that he has the financial resources to promote visitation, computer e-mails, and telephone calls between Tyler and Geoff.

The final witness to testify on Soryia’s behalf was Amy Conry, Tyler’s fourth-grade teacher. She described Tyler as “an above average student,” a “hard worker,” as “very well behaved,” and as a “great kid.” Tyler’s teacher testified that her contact was with Soryia when dealing with Tyler’s academic performance, and that Soryia would routinely call her if she had concerns or questions with respect to Tyler’s schooling. Conry stated that she remembered Geoff attending one school open house, but that she never discussed Tyler’s academic performance with him.

The next witness to testify at the hearing was Geoff. He stated that he lives in a three-bedroom, single-family home in Hampshire with his son Geoffrey, his new wife Carol Lynn, and her six-year-old son Tommy. The home has a backyard with a swimming pool and a trampoline. According to Geoff, when Tyler stays over he now shares a room with Tommy. Geoff stated that he is employed as an electrician, and earns approximately $70,000 per year.

Geoff testified that he has never missed a weekend visitation with Tyler. Geoff did acknowledge, however, that he has, at times, worked overtime hours during a portion of the Saturdays on which he was scheduled for visitation with Tyler. During the time he was working, the brothers were either alone together, or they were with Soryia. Geoff testified that he now works overtime hours only on those Saturdays that he does not have scheduled visitation with Tyler. Geoff also stated that, immediately after the divorce, he had been able to spend additional time with Tyler other than the alternating weekends. Geoff described the situation at that time as “very flexible,” and stated that if he wanted to see Tyler and spend time with him, he could do so. In addition, Geoff often picked Tyler up from his after-school baby-sitter and watched him until Soryia picked him up after work. This arrangement ended when Soryia took Tyler out of the baby-sitter’s care and placed him in day care, about a year earlier. Geoff also stated that when Soryia traveled overnight for her job, she at first left Tyler in his care. This situation changed, however, when Soryia had a friend stay with Tyler in their apartment during those trips. Geoff testified that he no longer considers visitation time with Tyler to be as flexible as it once was.

According to Geoff, Tyler sees Geoff’s extended family about once a month, and also on holidays and for family events. Geoff testified that immediately after the divorce, Soryia would let Tyler attend all family events, but more recently Tyler has been unable to attend events that do not fall on Geoff’s visitation weekend. Geoff stated that Tyler and his brother Geoffrey have a “very good relationship” and that they do things together like swim and use the trampoline. Geoff stated that he engages in many outdoor activities with the boys, such as swimming and skiing, and that he also has supported Tyler’s interests by visiting Tyler’s dance class and attending his dance recitals. Geoff also testified that he accompanied Tyler to his school on the orientation day at the beginning of the year and visited his classroom, and that he also attended an open house at Tyler’s school. However, Geoff testified that he had no opportunity to speak with Tyler’s teacher on either occasion. Geoff testified that Soryia regularly keeps him informed about Tyler’s academic progress.

Geoff described his relationship with Tyler as “very close, very loving,” and stated that Tyler is very affectionate towards him. Geoff said that he is opposed to the move because he believes that it is not in Tyler’s best interests to uproot him from his immediate family, his extended family, and his friends. In addition, Geoff expressed concern over Tyler having to travel long distances on a regular basis, and observed that he would not be able to see Tyler every other weekend. Geoff stated that his new wife, Carol Lynn, has a “good” relationship with Tyler, and that Tyler’s relationship with Carol Lynn’s son Tommy is “fair,” but “getting better.” Geoff admitted that he made negative comments about Mark in front of the children, and expressed regret over the statements. Geoff also testified that he has no personal animosity towards Soryia.

On cross-examination, Geoff admitted that he neither investigated nor considered any of the opportunities available to Tyler in Sharon, and acknowledged that the move would not be in Geoff’s own best interests. Geoff also admitted that during the upcoming weekend he planned to take Tyler to an amusement park, and stated that Soryia allowed him to do this even though he was not scheduled for visitation that weekend. In addition, Geoff admitted that he did not know the names of Tyler’s current or previous teachers, and that he had not attended Tyler’s parent-teacher conferences because Soryia “would always take care of that” when they were married. Geoff also acknowledged that the visitation schedule proposed by Soryia provided him with visitation that exceeded the time he currently had with Tyler, and stated that Tyler has enjoyed his previous trips to Sharon.

The next witness to testify on Geoff’s behalf was Gary Wright, the principal of Hampshire Elementary School. Principal Wright stated that the results of standardized testing done at the school when Tyler was in the third grade revealed that Tyler met state standards in all academic areas. In addition, the principal testified that Tyler did not have any disciplinary or behavioral problems. According to Principal Wright, the percentage of third-grade Hampshire Elementary School students who either met or exceeded state standards was higher than both the district and state average, that the average Hampshire student-to-teacher ratio is approximately 23 to 1, that extracurricular activities are offered after school, and that there is an emphasis upon computers in the classroom. Principal Wright acknowledged that the amount of money spent per student at Hampshire Elementary School is less than the state average, and admitted that the school district was experiencing financial difficulties which may result in a future deficit.

 The next witness to testify was Carol Lynn Collingbourne, who stated that she and Geoff were married in July 2001. She described the relationship between Geoff and Tyler as “very loving,” stated that they are very affectionate towards each other, and noted that they enjoy doing many fun things together. Carol Lynn also testified that Tyler and his brother Geoffrey are “close,” that they “have fun” doing different activities together, and that Tyler looks up to his older brother. Carol Lynn also stated that the relationship between Tyler and her son Tommy is “fine.” Carol Lynn described her own relationship with Tyler as “very good,” and stated that Tyler is a “loveable kid, very fun to be around, happy-go-lucky.” She testified that on one occasion she told Tyler that she would be willing to watch him for the day instead of his going to day care. On another occasion she told Tyler that, on her days off, she would be willing to watch him. Tyler then called Soryia to ask his mother if this arrangement would be acceptable. Carol Lynn herself then called Soryia because Tyler seemed upset after the conversation. Carol Lynn stated that Soryia did not accept her offer.

The final witness was Lori Price, Geoff’s sister. She lives in Hampshire, about four blocks from Geoff. Lori testified that Geoff has a “very close” and “very affectionate” relationship with his children. According to Lori, her family spends a great deal of time with Geoff and his family, and they all get together with their extended family for social events on a regular basis. Lori testified that in July 2001, she told Tyler that, if it was acceptable to his parents, she would watch him for a few days per week instead of him going to day care. Lori testified that this was the first time she had offered to care for Tyler, even though Tyler was in day care for several years. Lori also acknowledged that this offer came after Soryia filed the petition for removal, although Lori denied that the offer was related to the petition. Lori stated that Geoff told her that her offer would not be accepted.

The circuit court also conducted an 
in camera
 interview of Tyler. Tyler stated that he had accompanied his mother to Massachusetts about four times and that he thought it was “okay.” Tyler told the judge that he has been on an airplane “a lot,” and that he usually likes traveling on them. Tyler expressed fear of leaving his father, his family, and his friends, and stated that he told his mother that he did not want to move to Massachusetts. Tyler also stated that he “sometimes” gets along well with his brother Geoffrey.

Tyler also told the court that in the past his mother has had to travel overnight for her job, and sometimes he stayed with his father and sometimes with a baby-sitter. Lately, however, Tyler stated, his mother had not been going on as many trips. Tyler described day care as “boring” and stated that because he is one of the older children he does not like to go to there. Tyler testified that before his mother placed him in day care, he was watched by a baby-sitter after school until his mother finished work.

 On September 17, 2001, the circuit court entered a written order granting Soryia’s petition to remove Tyler from Illinois to Massachusetts. The court stated that its ruling was guided by the requirements of section 609 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609 (West 2000)) as well as this court’s decision in 
In re Marriage of Eckert
, 119 Ill. 2d 316 (1988). First, the circuit court found that neither Soryia nor Geoff had an improper motive in requesting or objecting to Tyler’s removal. In addition, the circuit court found that the general quality of life for both Soryia and Tyler would be enhanced as a result of the move. The court determined that Soryia met her burden of proof on this issue “by demonstrating that the initial disruption caused by the move would be outweighed by the benefits resulting from the move.” The court observed that granting the petition for removal would allow Soryia to marry Mark, and that she and Tyler would be able to live in Mark’s home in Sharon. Soryia would then obtain a job with a greater salary, and also be able to conform her work schedule to Tyler’s school schedule. Tyler could then be enrolled in a school system that Soryia believed offered Tyler “superior opportunities” to those available in Hampshire. The court also noted that the existing joint custody arrangement had already resulted in a separation of the siblings, as they lived in separate households and attended separate schools. Further, the court observed, Geoffrey is five years older than Tyler, and it could be reasonably assumed that their interests are different.

The circuit court also considered the visitation rights of Geoff and determined that a realistic and reasonable visitation schedule could be reached if the move were allowed. The court stated that the “arrangement proposed by Soryia is on balance a reasonable and realistic method of handling an obviously disruptive event in the life of this child.” The court considered the actual visitation time available to Geoff and Tyler under the proposed visitation arrangement as opposed to the existing visitation schedule, and found that the arrangements were “comparable.” The court determined that Tyler would be able to maintain a close relationship with Geoff as a result of the extended periods of visitation, even though the distance between them would limit the frequency of that contact. The court also observed that Soryia would be able to afford transportation to allow Tyler to visit his father on a regular basis, and that Soryia offered to accompany Tyler for visitation until he was old enough to travel alone. The court also considered the time that would be spent by Tyler traveling to and from Illinois, but found that the “time involved would not be substantially greater than it would be if Soryia were to move to Central or Southern Illinois.”

The circuit court concluded by observing that it had “tried to make a reasoned assessment as to the best interests of this child. In summary, this case, as in almost all removal cases, involves the disruption of the lives of the parties and the children, in addition to the extended family, soon after the initial turmoil and heartache occasioned by the divorce itself. Here, the parties agreed that it was in the child’s best interests to divide residential custody from the outset. Geoff has began a new life with his present wife and her son; Soryia wishes to do the same. Unfortunately, circumstances dictate that in order for her to achieve this goal, it is necessary for her to relocate.” The circuit court held that “the weight of the evidence favors the removal in this case. The best interests of Tyler lie in allowing Soryia to remove him to Massachusetts, subject to the proposed visitation schedule. To do otherwise in this case would in the court’s opinion result in a disservice to this child.” Thereafter, Geoff filed a notice of appeal.

A majority of the appellate court panel reversed the judgment of the circuit court. 332 Ill. App. 3d 665. The appellate majority focused upon the circuit court’s finding that the evidence did not establish that Tyler would experience a substantial direct benefit as a result of the move to Massachusetts. According to the appellate majority, the bulk of the evidence presented at the hearing by Soryia “related to benefits [Soryia] would derive by moving to Massachusetts, remarrying, and living with the man she loves.” 332 Ill. App. 3d at 671. The majority held that “it is insufficient to focus only on the improvement of the custodial parent’s life. Rather, the improvement in the custodial parent’s quality of life is only important insofar as it increases and furthers the child’s quality of life.” 332 Ill. App. 3d at 671. According to the appellate majority, although Soryia presented evidence that she would derive a direct benefit from the move by enjoying an increased standard of living, residing in a larger home, and earning a greater income working for Mark’s company, “an increased standard of living will occur in almost every case of remarriage *** [and] cannot alone be determinative.” 332 Ill. App. 3d at 671.

The appellate majority then examined the revised visitation schedule entered by the circuit court as a result of granting the removal petition. The majority initially observed that Geoff “has diligently exercised his visitation rights with Tyler,” and that it was therefore reluctant to interfere with Geoff’s rights for inadequate reasons. Although the appellate majority found that “the proposed visitation schedule would allow substantial visitation with [Geoff] for lengthy periods of time” (332 Ill. App. 3d at 671, 672), and was “comparable to the bimonthly/every-other-holiday visitation schedule in use” (332 Ill. App. 3d at 672), the appellate majority determined that the modified visitation arrangement was not in Tyler’s best interest. The majority expressed concern that the schedule would require Tyler to be away from his Massachusetts home during every school break for substantial periods of time, and would therefore interfere with his family and social life in Sharon. In addition, the appellate majority found that the 9 to 10 trips Tyler would be required to make between Massachusetts and Illinois each year were “time consuming” and “burdensome.” 332 Ill. App. 3d at 672.

The appellate majority concluded that “the evidence presented at the hearing, in conjunction with the factors set forth in 
Eckert
, indicates that removing Tyler to Massachusetts is not in his best interest. Although the move may provide an indirect benefit to Tyler by virtue of the benefits that [Soryia] will experience by marrying Mr. Rothman, we cannot conclude that this evidence outweighs Tyler’s interest in maintaining a close relationship with his father, natural brother, and extended family in Illinois.” 332 Ill. App. 3d at 672.

In dissent, Justice Bowman stated that, in his view, the majority’s reasons for reversing the judgment of the circuit court “amount to nothing more than a substitution of its factual findings for those of the trial court.” 332 Ill. App. 3d at 672-73 (Bowman, J., dissenting). First, the dissenting justice stated, the majority failed to demonstrate that the trial court’s findings were contrary to the manifest weight of the evidence, and that, contrary to the suggestion of the majority, “there is no indication that [the circuit court] placed too much emphasis on the ‘indirect benefit’ factor.” 332 Ill. App. 3d at 673 (Bowman, J., dissenting). In addition, the dissenting justice observed that although the majority found fault with the circuit court’s determinations regarding the proposed visitation schedule, “[t]he majority seems to forget that it is not our job to second-guess the trial court’s decisions on such matters, but only to determine whether they are against the manifest weight of the evidence.” 332 Ill. App. 3d at 673-74 (Bowman, J., dissenting). Justice Bowman observed that although the proposed visitation schedule may be considered to be more inconvenient than the current arrangement, it nevertheless “is a reasonable and realistic method of handling an obviously disruptive event in Tyler’s life *** [while allowing Tyler] to maintain a close relationship with his father despite the physical distance between them.” 332 Ill. App. 3d at 674 (Bowman, J., dissenting). The dissenting justice concluded by stating that he would “affirm the trial court because the trial court was in the best position to observe Tyler, his parents, and the other witnesses, and to evaluate their temperaments, predilections and capabilities in determining Tyler’s best interest.” 332 Ill. App. 3d at 674 (Bowman, J., dissenting).

We granted Soryia leave to appeal. 177 Ill. 2d R. 315.

ANALYSIS

Section 609 of the Illinois Marriage and Dissolution of Marriage Act (Act) governs petitions for removal. 750 ILCS 5/609(a) (West 2000); 
In re Marriage of Eckert
, 119 Ill. 2d 316 (1988). The statute provides in relevant part:

“The court may grant leave *** to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal.” 750 ILCS 5/609(a) (West 2000).

Soryia contends that she has satisfied her burden of showing that the removal of Tyler from Illinois to Massachusetts would be in his best interests. Therefore, Soryia argues, the appellate majority below erred in reversing the circuit court’s grant of the removal petition. Soryia maintains that the appellate majority incorrectly required the parent seeking removal to prove that the child would reap a direct benefit from the move, and improperly refused to give weight to the substantial indirect benefits that flow to a child as a result of the enhancement of the general quality of life for the custodial parent.

Geoff responds that the appellate majority below properly reversed the circuit court’s grant of the removal petition on the basis that the circuit court’s determination was against the manifest weight of the evidence and allowed a manifest injustice to occur. Geoff asserts that reversal was appropriate because Soryia’s sole reason for seeking to remove Tyler from Illinois and move to Massachusetts was so that she could marry and live with Mark. In his pleadings to this court, Geoff argues that there “was no demonstration of any real benefit to Tyler” resulting from Soryia’s remarriage that would justify Tyler’s removal. Indeed, Geoff observes, “even the trial court found that there was no direct benefit to Tyler.” Geoff contends that, at best, the evidence showed that Tyler would experience “neutral changes” from the move. Geoff urges this court to clarify that in removal actions “indirect benefits and direct benefits which inure only to the parent who wishes to leave the state are not sufficient to meet the petitioner’s burden and that indirect benefits to the child, without more, are not sufficient.” Thus, Geoff urges us to require custodial parents seeking to remove their children from Illinois to establish that the children will experience a direct benefit from the move. We disagree.

In 
In re Marriage of Eckert
, 119 Ill. 2d 316 (1988), this court addressed the issue of a custodial parent’s right to remove a child to another state. We noted in 
Eckert
 that the General Assembly had then recently amended section 609 of the Act to clarify that the burden of proof in removal proceedings is on the party seeking removal to show that the move would be in the child’s best interests. 
Eckert
, 119 Ill. 2d at 325. Indeed, we emphasized that the best interests of the child is the “paramount question” which must be considered in removal actions. 
Eckert
, 119 Ill. 2d at 325. We cautioned that a best interests determination “cannot be reduced to a simple bright-line test,” and held that a ruling on the best interests of a child “must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case.” 
Eckert
, 119 Ill. 2d at 326. We also stressed that “[a] trial court’s determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred.” 
Eckert
, 119 Ill. 2d at 328. We explained that such deference was appropriate because “ ‘[t]he trier of fact had significant opportunity to observe both parents and the child and, thus, is able to assess and evaluate their temperaments, personalities, and capabilities.’ ” 
Eckert
, 119 Ill. 2d at 330, quoting 
Gallagher v. Gallagher
, 60 Ill. App. 3d 26, 31 (1978). Accordingly, we held that “ ‘[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case.’ ” 
Eckert
, 119 Ill. 2d at 330, quoting 
Gallagher v. Gallagher
, 60 Ill. App. 3d 26, 31-32 (1978).

We also held in 
Eckert
 that, in determining what is in the best interests of a child, the circuit court should hear any and all relevant evidence. 
Eckert
, 119 Ill. 2d at 326. Because a child has an important interest in “maintaining significant contact with both parents following the divorce,” we held that the “mere desire of the custodial parent to move to another State, without more, is insufficient to show that the move would be in the child[ ]’s best interest.” 
Eckert
, 119 Ill. 2d at 325. In order to assist a circuit court in determining a child’s best interests, we suggested several factors which should be considered by the court in making this ruling. First, the circuit court “should consider the proposed move in terms of likelihood for enhancing the general quality of life for both the custodial parent and the children.” 
Eckert
, 119 Ill. 2d at 326-27. Second, the circuit court should “consider the motives of the custodial parent in seeking the move to determine whether the removal is merely a ruse intended to defeat or frustrate visitation.” 
Eckert
, 119 Ill. 2d at 327. Third, the court should assess “the motives of the noncustodial parent in resisting the removal.” 
Eckert
, 119 Ill. 2d at 327. In addition, we observed that because “[i]t is also in the best interests of a child to have a healthy and close relationship with both parents, as well as other family members,” the circuit court should “carefully consider” the visitation rights of the noncustodial parent. 
Eckert
, 119 Ill. 2d at 327. To this end, the circuit court must assess “whether, in a given case, a realistic and reasonable visitation schedule can be reached if the move is allowed.” 
Eckert
, 119 Ill. 2d at 327. We defined a “reasonable visitation schedule” as one that “will preserve and foster the child’s relationship with the noncustodial parent.” 
Eckert
, 119 Ill. 2d at 327. We also noted that “[w]hen removal to a distant jurisdiction will substantially impair the noncustodial parent’s involvement with the child, the trial court should examine the potential harm to the child which may result from the move.” 
Eckert
, 119 Ill. 2d at 328.

We have subsequently emphasized, however, that in determining the best interests of a child in a removal action, the 
Eckert
 factors “are not exclusive.” 
In re Marriage of Smith
, 172 Ill. 2d 312, 321 (1996). Accordingly, a circuit court may validly consider other relevant factors, as dictated by the specific circumstances of each case, in arriving at a best interests determination. In addition, no one factor is controlling. The purpose of the factors set forth in 
Eckert
 are not to establish a test in which the parent seeking removal must meet every prong; rather, the 
Eckert
 factors are to be considered and balanced by the circuit court in arriving at a best interests determination, “and the weight to be given each factor will vary according to the facts of each case.”
 Smith
, 172 Ill. 2d at 321.

Soryia asserts that the circuit court properly applied our decision in 
Eckert
 in granting her petition for removal, and that the appellate majority improperly reversed the circuit court’s judgment. We agree. In this case, the circuit court conducted a thorough hearing, heard extensive testimony, and issued a written opinion in which it applied the 
Eckert
 guidelines to the facts presented and concluded that, upon balancing the various relevant factors, removal was in Tyler’s best interests. We cannot say that the circuit court’s ruling was against the manifest weight of the evidence.

The first 
Eckert
 factor is the likelihood that the proposed move will enhance the general quality of life for both the custodial parent and the child. 
Eckert
, 119 Ill. 2d at 326-27. With respect to this factor, the circuit court held that Soryia met her burden of proof “by demonstrating that the initial disruption caused by the move would be outweighed by the benefits resulting from the move.” The circuit court acknowledged that by allowing Tyler to be removed to Massachusetts, Tyler would be separated from his brother Geoffrey, would be forced to leave his friends, and would lose the closeness of his relationship with his father as well as his extended family. However, the court also observed that by granting Soryia permission to remove Tyler to Massachusetts, Soryia could marry Mark, live in his home in Sharon, obtain employment with a greater salary, enroll Tyler in a school system which she believed offered her son superior educational and extracurricular opportunities, conform her work schedule to Tyler’s school schedule, and afford transportation allowing Tyler to spend as much time with his father as before the move. Although the circuit court found that Tyler did not derive a “direct” benefit from the move, it also found that Tyler derived a substantial “indirect” benefit from the enhancement of Soryia’s life should removal be allowed.

Geoff, echoing the apparent position of the appellate majority below, urges us to hold that a custodial parent seeking to remove a child must show a “direct” benefit to the child in order to sustain the removal petition. Geoff also urges us to hold that any “indirect” benefits that may flow to the child as a result of an enhancement in the custodial parent’s quality of life are insufficient to justify a child’s removal from this state. Accordingly, Geoff contends that because the circuit court determined that Soryia had failed to show that Tyler would reap a “direct” benefit from the move to Massachusetts, the circuit court erred in granting the removal petition, and the appellate court correctly reversed that judgment. We disagree.

As we emphasized in 
Eckert
, the “paramount question” presented by removal cases is whether the move is in the best interests of the child. 
Eckert
, 119 Ill. 2d at 325; see also 750 ILCS 5/609(a) (West 2000). In 
Eckert
, we did not characterize the benefits a child may experience as a result of a move as “direct” or “indirect,” and we find that such a distinction is not particularly helpful in assisting the circuit court in making the important determination of whether removal is in the child’s best interests. To the contrary, this distinction may divert focus from the real issue of whether the child’s general quality of life will be enhanced by the move. See 
Eckert
, 119 Ill. 2d at 326-27. We reiterate our holding in 
Eckert
 that in conducting a best interests inquiry in the context of a removal petition, a circuit court must “consider the proposed move in terms of likelihood for enhancing the general quality of life for 
both
 the custodial parent 
and 
the children.” (Emphases added.) 
Eckert
, 119 Ill. 2d at 326-27; see also 
Smith
, 172 Ill. 2d at 322-23. Indeed, “[i]f only the direct benefits that affected children were considered, rarely would a situation arise where removal would be permitted where children were in a good environment with good schools, good parents, and good friends.” 
In re Marriage of Ludwinski
, 312 Ill. App. 3d 495, 499 (2000). The vast majority of cases from our appellate court have correctly interpreted our decision in 
Eckert
 and, in determining the best interests of a child in removal actions, have appropriately considered the potential of the move for increasing the general quality of life for both the custodial parent and the child, including any benefit the child may experience stemming from the parent’s life enhancement. See, 
e.g.
, 
In re Marriage of Shaddle
, 317 Ill. App. 3d 428, 434 (2000); 
Ludwinski
, 312 Ill. App. 3d at 499; 
In re Marriage of Miroballi
, 225 Ill. App. 3d 1094, 1098 (1991); 
In re Marriage of Carlson
, 216 Ill. App. 3d 1077, 1081 (1991); 
In re Marriage of Roppo
, 225 Ill. App. 3d 721, 728 (1991); 
In re Marriage of Taylor
, 202 Ill. App. 3d 740, 745 (1990); 
In re Marriage of Zamarripa-Gesundheit
, 175 Ill. App. 3d 184, 189 (1988). It follows that what is in the best interests of the child cannot be considered without assessing the best interests of the other members of the household in which the child resides, most particularly the custodial parent.

Indeed, absurd results would occur were we to accept the contrary argument advanced by Geoff that a custodial parent wishing to remove a child from Illinois must prove that the child will experience a “direct” benefit as a result of the move, and that proof the child will reap “indirect” benefits as a result of the enhancement in the quality of life for the custodial parent is insufficient to meet this burden. First, as stated, Geoff’s position ignores the fact that the best interests of the child cannot easily be severed from the interests of the custodial parent with whom the child resides, and upon whose mental and physical well-being the child primarily depends. Because the principal burden and responsibility of child rearing falls upon the custodial parent, there is a palpable nexus between the custodial parent’s quality of life and the child’s quality of life.

This principle is illustrated in the case at bar. Upon dissolution of the marriage, Soryia was awarded physical custody of Tyler and has had to deal with all the day-to-day issues a single parent must face, including the child’s physical and emotional well-being, the child’s school performance, and the care of the child when he is not in school and Soryia cannot be with him. In addition, as evinced by the facts in the matter at bar, a single parent must also face a myriad of financial, social, and scheduling pressures, including the conflict between the parent’s work schedule and the parent’s desire to have the child become involved in extracurricular activities in which the child expresses an interest. At the time of the hearing on the removal petition, Soryia planned to marry a man who would provide her with love, economic security, and a comfortable home in a desirable location, and also be a partner and helper in rearing her child. It is in this new family structure that Tyler’s day-to-day routine and emotional interaction would be formed and influenced. Thus, it is reasonable to assume that there is a nexus between the quality of life of the custodial parent and the quality of life of the child.

Second, requiring a parent seeking removal to establish that the child would “directly” benefit from the move, to the exclusion of any “indirect” benefits experienced by the child, would mean that the remarriage of a custodial parent would rarely, if ever, provide a valid basis for removal. Requiring the custodial parent to meet such a heavy burden of proof would not only 
de facto
 eliminate the balancing process set forth in 
Eckert
, but also impermissibly “allow[ ] a noncustodial parent who enjoys a good relationship with his child[ ] to veto the good-faith and reasonable desire of the custodial parent to remarry and move out of State without any consideration of what have been called the ‘indirect benefits’ to the child[ ].” 
In re Marriage of Eaton
, 269 Ill. App. 3d 507, 514 (1995). Such a result would also contravene the intent of the General Assembly, as expressed in section 609 of the Act, which allows a custodial parent to remove a child from Illinois upon a proper showing that such removal is in the child’s “best interests.” 750 ILCS 5/609(a) (West 2000). We agree with those courts that have held that the interests of the custodial parent should not be automatically subordinated to those of the noncustodial parent in a removal action. See 
Shaddle
, 317 Ill. App. 3d at 435; 
Ludwinski
, 312 Ill. App. 3d at 503; 
Eaton
, 269 Ill. App. 3d at 517; 
In re Marriage of Branham
, 248 Ill. App. 3d 898, 905 (1993). Indeed, “our society is a mobile one” (
Eckert
, 119 Ill. 2d at 330) and “since a court has no power to require the noncustodial parent to remain in Illinois, or to require members of the extended family to remain in Illinois, some deference is due to the custodial parent who has already determined the best interests of her child[ ] 
and
 herself are served by remarriage and removal. The best interests of children cannot be fully understood without also considering the best interests of the custodial parent.” (Emphasis in original.) 
Eaton
, 269 Ill. App. 3d at 515-16.

Our decision today, however, should not be interpreted as standing for the proposition that any enhancement in the quality of life of the custodial parent automatically translates into an improvement in the quality of life for the child, or that such benefits will always be sufficient to warrant removal. However, we emphasize that because there is a nexus between the well-being of the custodial parent and the child who is in this parent’s care, all benefits afforded to the child as a result of the move must be considered by the circuit court in making its best interests determination. We caution, however, that in making this determination, a circuit court should not limit its examination solely to enhanced economic opportunities for the custodial parent. A court must also consider other noneconomic factors resulting from the move which are likely to contribute to, or detract from, the well-being and happiness of the custodial parent and the child. We reiterate our holding in 
Eckert
 that a custodial parent’s mere desire to move to another state, without more, is an insufficient basis for removal. 
Eckert
, 119 Ill. 2d at 325. The burden of proof remains upon the custodial parent to establish that the move would be in the best interests of the child. 
Eckert
, 119 Ill. 2d at 330; 750 ILCS 5/609(a) (West 2000).

As stated, the circuit court determined that Tyler would experience substantial “indirect” benefits as a result of moving with his mother to Massachusetts, and concluded that the evidence presented on this specific factor favored the move. The court observed that as a result of the move, Soryia would be able to marry Mark and live in his home in Sharon. The creation of a new family unit and the social environment of a traditional family setting may be considered an important benefit to a child. The circuit court also found that Soryia established that as a result of the move she has the opportunity to become an integral part of a family-owned business and substantially increase her income. An improvement in the financial situation of the custodial parent will generally benefit a child by enhancing the child’s standard of living. In addition, the circuit court found that as a result of the move Soryia could schedule her work hours around Tyler’s school day, and be available to transport him to and from school and also extracurricular activities. This is in contrast to the situation in Illinois, where Tyler went from day care to school, and from school back to day care, offering him little family life until after 5 p.m. The flexibility of Soryia’s work schedule would benefit Tyler not only by allowing his mother to spend more time with him, but also by permitting his mother to withdraw him from a day care environment in which he was unhappy and providing her the opportunity to enroll Tyler in various activities that were unavailable to him as a result of her work schedule. Soryia’s new work arrangement would afford her the time, energy and means to be a part of Tyler’s life in ways that had not been possible in the past. In addition, the circuit court found that the move will allow Tyler to attend a school system that Soryia believes will offer Tyler academic opportunities superior to those available in Hampshire. Although the circuit court found that the evidence pertaining to the school systems in Sharon and Hampshire was “not conclusive,” the court also found that the school system in Sharon “is at least comparable to that of Hampshire.” In addition, the circuit court found that the educational and cultural amenities are plentiful in the area in which Soryia wishes to relocate. In assessing whether the move to Massachusetts would enhance the quality of Tyler’s life, the circuit court also observed that the existing joint custody arrangement “has already resulted in the separation of the siblings in this case.” The court noted that the brothers already resided in separate households, attended separate schools, and that the five-year age difference between Geoffrey and Tyler underscored their different interests.

We conclude that, on this record, the circuit court appropriately applied 
Eckert
. The court considered and weighed the panoply of benefits flowing to Tyler as a result of the improvements to the quality of life that would be realized by his custodial parent as a consequence of the move. Based upon its careful consideration of the evidence, the circuit court concluded that the move to Massachusetts would enhance the quality of life for both Soryia and Tyler. Therefore, with respect to this specific 
Eckert
 factor, the circuit court held that removal was in the best interests of Tyler. Because the determination of the circuit court was not against the manifest weight of the evidence, the appellate majority below committed error in reversing the circuit court’s judgment.

The second and third factors set forth in 
Eckert
 require the circuit court to assess the motives of the custodial parent in seeking the move and the motives of the noncustodial parent in contesting the move. 
Eckert
, 119 Ill. 2d at 327. We agree with the circuit court that “[t]he evidence as to the motives of the parties in requesting and opposing the proposed move make it clear that neither party has an invalid motive for his or her actions.” The record reveals that the parties are well-intentioned, concerned and conscientious. Therefore, these two 
Eckert
 factors do not weigh against either party.

The final 
Eckert
 factors deal with visitation rights. In 
Eckert
, we stressed that because it is in a child’s best interests to have a healthy and close relationship with both parents, as well as other family members, the circuit court must carefully consider the effect the proposed move would have on the visitation rights of the noncustodial parent. 
Eckert
, 119 Ill. 2d at 327. We instructed the lower courts to assess whether, under the facts and circumstances of a given case, a realistic and reasonable visitation schedule can be reached if the move is allowed. 
Eckert
, 119 Ill. 2d at 327. We also cautioned that “[w]hen removal to a distant jurisdiction will substantially impair the noncustodial parent’s involvement with the child,” the circuit court should assess “the potential harm to the child which may result from the move.” 
Eckert
, 119 Ill. 2d at 328.

In the case at bar, the circuit court found that in the past Geoff had “exercised his visitation in a regular manner,” but noted that Soryia alleged that Geoff would often work on Saturday mornings to the exclusion of his visitation with Tyler. The court also observed that Geoff testified that “he has stopped this practice” and is seeing Tyler for the entire weekend. The court then compared the existing visitation arrangement with the visitation schedule proposed by Soryia if the move were granted. Under the existing arrangement, each of the parties has both of the children on alternate weekends and alternate holidays. Under the proposed visitation schedule, Tyler would visit Geoff for 8 to 10 weeks in the summer, 1 week at winter break in February, 1 week at spring break in April, during the Thanksgiving and Christmas breaks, and at any other times upon the agreement of the parties. The circuit court found that in comparing the two visitation arrangements, the actual time that Tyler and Geoff would be together was roughly equivalent. In addition, the court found that the visitation schedule proposed by Soryia is “a reasonable and realistic method of handling an obviously disruptive event in the life of this child. Tyler will be able to maintain a close relationship with his father even though the distance between them will limit the frequency of the contact.” We conclude that, under the circumstances presented, the circuit court’s finding with respect to this factor was not manifestly erroneous.

In all instances, removal will have some effect on visitation. The pivotal question is whether a reasonable and realistic visitation schedule can be created. The record reflects that Soryia has cooperated in visitation and has actively fostered Tyler’s relationship with Geoff and his extended family. Although Geoff stated during the hearing that his visitation with Tyler had recently become somewhat less flexible, Soryia proffered unrebutted testimony that reasonably explained the decrease in Geoff’s unscheduled time with Tyler. Significantly, there was no testimony that Geoff had ever been denied his scheduled visitation time with Tyler. There is no indication in the record that Soryia will not continue to cooperate in a reasonable manner to preserve and enhance Geoff’s relationship with Tyler.

We agree with the circuit court that the visitation schedule proposed by Soryia is realistic and reasonable. The circuit court found that Geoff had been diligent with respect to the exercise of his visitation rights. Although the nature of the relationship between Geoff and Tyler will change under the proposed visitation arrangement, becoming a long-distance relationship, the quality of that relationship need not be adversely impacted. “Close relationships can continue and even be enhanced when effort is expended to establish a reasonable visitation schedule.” 
Ludwinski
, 312 Ill. App. 3d at 504-05; 
Eaton
, 269 Ill. App. 3d at 515; 
Taylor
, 251 Ill. App. 3d at 61-62; 
Zamarripa-Gesundheit
, 175 Ill. App. 3d at 189-90. Under the proposed arrangement, there is no decrease in the amount of time that Geoff and Tyler will be able to spend together; to the contrary, the visitation time is approximately equivalent to that under the old arrangement.

We caution, however, that a proposed visitation schedule which provides a noncustodial parent with the same number of visitation days as under the prior visitation arrangement does not automatically lead to the conclusion that the quality of the visitation between the child and the noncustodial parent will also be the same. We emphasize that a circuit court must not only evaluate the quantitative change in visitation, but must also carefully assess the qualitative difference in visitation. In the matter at bar, the former bi-monthly visitation would be replaced with a schedule which allows for less frequent, but more extended, contact between Tyler and Geoff. In its written opinion, the circuit court correctly noted that although the visitation arrangements were comparable in terms of the actual time Geoff and Tyler would spend together, the relevant inquiry was not complete until it also evaluated the qualitative change in Geoff and Tyler’s relationship. The circuit court determined that, under the specific facts presented, “Tyler will be able to maintain a close relationship with his father even though the distance between them will limit the frequency of that contact.” We conclude that, under the facts of this case, the circuit court’s holding on this issue was not against the manifest weight of the evidence. A longer, uninterrupted period of visitation time may foster a more meaningful relationship between father and son, and the extended length of the summer visits may afford Tyler the opportunity to spend more uninterrupted time with family and friends.

In addition, both Soryia and Mark appear to be sincere in their desire that Tyler have a continuing and meaningful relationship with Geoff and Geoff’s extended family, and to do whatever is necessary to assure this. Mark stated that because he had a very close relationship with his own father, he understood the importance of Tyler’s maintaining a close relationship with Geoff. Both Soryia and Mark stated that they will have the financial means necessary to ensure that Tyler maintains close contact with his father and also his extended family. They stated that they would pay for the costs of transporting Tyler to Illinois, and also pay for long distance phone calls and e-mails so that Tyler could have regular contact with Geoff between his visits.

We note that although Tyler expressed a desire to remain in Illinois and not move to Massachusetts, we believe that this a natural response for a child of his age, and that it is not sufficient to justify denying Soryia’s petition. In addition, we observe that Geoff harbored concerns about the length of time Tyler would have to travel, which may extend from 3 to 5 hours each way. However, as the circuit court observed in its written order, “the time involved would not be substantially greater than it would be if Soryia were to move to Central or Southern Illinois.”

In the final analysis, we adhere to our statement in 
Eckert
 that a trial court’s examination of a removal petition should be guided by the policies of the Act, one of which is to “ ‘secure the maximum involvement and cooperation of both parents regarding the physical, mental, moral and emotional well-being of the children during and after the litigation.’ ” 
Eckert
, 119 Ill. 2d at 328, quoting Ill. Rev. Stat. 1987, ch. 40, par. 102(7), now 750 ILCS 5/102(7) (West 2000). We agree that policy is “best served when, in addition to a favorable determination of all of the 
Eckert
 factors, the court considers the aspects of cooperation of both parents in achieving as reasonable an expectation of normalcy and family life for the child involved as can be achieved following a divorce, which includes adjustments to stepparents in the event of the remarriage of one or both parents.” 
In re Marriage of Roppo
, 225 Ill. App. 3d at 732.

We note that “it is obvious that for the child the fact of the divorce becomes the predicate of his subsequent relationship with both parents, and that relationship can never be the same as it would have been had the marriage remained intact. Adjustments and accommodations must be made as a result of the divorce, the whole point of which was to permit each parent to go on his or her own way. Within reason, both parties must be permitted to do so, and the child’s best interests must be served within that context.” 
Helentjaris v. Sudano
, 194 N.J. Super. 220, 230, 476 A.2d 828, 833 (1984). We recognize the importance of preserving a child’s relationship with the noncustodial parent. However, as we set forth in 
Eckert
 and reiterated in 
Smith
, this factor must be weighed against the enhancement of the quality of life for the child as a result of the remarriage of his custodial parent and the child’s move to another state. In removal actions, the best interests of the child are controlling. As stated, a trial court’s determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred. 
Eckert
, 119 Ill. 2d at 328. We conclude that, under the facts presented, the circuit court’s determination that removal was in the best interests of Tyler was not against the manifest weight of the evidence. Accordingly, the appellate court erred in reversing the judgment of the circuit court.

 CONCLUSION

For the foregoing reasons, the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

Appellate court judgment reversed;

circuit court judgment affirmed.