VINCENT R. FISHER, Plaintiff-Appellant, v. JILL L. WALDROP, Defendant-Appellee.

Fourth District   No. 4—04—0863

Opinion filed February 16, 2005.—Rehearing denied March 14, 2005.

McCULLOUGH, J., dissenting.

Gregory A. Scott, of Scott & Scott, P.C., of Springfield, for appellant.

Jill Waldrop, of Richmond, Indiana, appellee *pro se.*

JUSTICE MYERSCOUGH delivered the opinion of the court:

Plaintiff, Vincent R. Fisher, appeals the trial court's order denying his petition for permanent injunction and granting permission to defendant, Jill L. Waldrop, to remove the parties' child from the State of Illinois. We reverse and remand with directions to grant the petition for permanent injunction.

## I. BACKGROUND

Vincent and Jill never married but are the parents of Callie Fisher, born on February 6, 1998. On May 8, 2001, Vincent filed a petition to establish a parent-child relationship and a petition to establish custody, visitation, and child support, all pursuant to the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/1 through 27 (West 2000)). On December 2, 2002, following a hearing, the trial court found by agreement of the parties that Vincent was the father of Callie. The court awarded exclusive custody to Jill and granted liberal visitation to Vin-

cent, which included alternating weekends and overnight visits every Thursday.

On July 5, 2003, Jill married Christopher Kitzke and moved to Williamsville, Illinois. In October 2003, Kitzke obtained new employment in Hagerstown, Indiana, located approximately 20 minutes from Richmond, Indiana. On December 5, 2003, Jill notified Vincent that she intended to move Callie to Indiana. Kitzke moved to Richmond in February 2004, while Jill and Callie remained in Springfield and lived with Jill's parents.

On December 24, 2003, Vincent filed a petition for temporary and permanent injunction pursuant to section 13.5 of the Parentage Act (750 ILCS 45/13.5 (West Supp. 2003)). The petition alleged that if Jill removed Callie from Illinois, irreparable harm would occur to Vincent and his relationship with Callie, he had no adequate remedy at law, and the removal of Callie from Illinois would not be in Callie's best interests. Vincent requested that, if Jill did move from Illinois, custody of Callie be given to Vincent, with reasonable visitation privileges granted to Jill.

On December 31, 2003, Jill filed a petition for leave to remove Callie from Illinois. On January 7, 2004, Jill filed a motion to dismiss her petition for leave to remove, claiming section 13.5 of the Parentage Act (750 ILCS 45/13.5 (West Supp. 2003)) governed petitions for removal in paternity cases and it was Vincent's burden to show that an injunction was appropriate. The trial court allowed the withdrawal of the petition in June 2004.

On March 26, 2004, the trial court granted Vincent's petition for evaluation and appointed Dr. Brian Heatherton, a clinical psychologist, to evaluate the impact of potential relocation on the relationship of Vincent with Callie. In June 2004, the court held a hearing on Vincent's petition for permanent injunction.

Dr. Heatherton testified for Vincent at the hearing, and the trial court admitted his report into evidence. The report and testimony indicated that Dr. Heatherton met with Callie, Vincent, and Jill individually and also observed each parent alone with Callie. He was unable, however, to observe Callie with her stepfather, Kitzke, because she did not wish to do so. Dr. Heatherton did, however, interview Kitzke and noted Kitzke's comment that "if we are coming together as a family, [Vincent] is going to have [to] sacrifice his relationship with Callie."

Dr. Heatherton interviewed numerous other individuals, including Callie's maternal grandmother, Beverly Waldrop, kindergarten teacher, Peggy Shanle, and Daisy Scout leader, Amber Calvert. Dr. Heatherton interviewed Matt Swenny, a licensed clinical professional

counselor, who provided individual and family counseling to Callie and her mother for approximately one year due to Jill's concerns about Callie's behavior. He also interviewed Dr. Helen Appleton, a licensed clinical psychologist, who saw Callie when she was $3^{1}/_{2}$ years old because of Jill's concerns that Callie displayed "anger[-]control" issues.

According to Dr. Heatherton, five factors are instrumental to a child's level of adjustment upon moving away to live with one parent: individual risk and vulnerability, parental level of distress, stress and socioeconomic disadvantage, family process, and change of family composition. Dr. Heatherton found Callie to be well-adjusted. He did have a concern, however, with Kitzke's instability in that he had many employment transitions. He also noted a risk factor to Callie's relationship with her father, namely, that fathers who lose visitation over time are marginalized and tend to drift away, which causes the child to experience loss.

One of Dr. Heatherton's biggest concerns was with the poor relationship between Vincent and Jill. He noted that how well the parents get along is a big predictor in the father-and-child relationship. For the move to be successful, Vincent would have to be informed of Callie's every success and failure, and Vincent must be given an opportunity to articulate his opinion regarding Callie's education, extracurricular activity, and discipline. Vincent would have to provide the same type of information to Jill when Callie visited him. The lack of communication between Vincent and Jill would affect Callie's ability to adjust to her new surroundings. Dr. Heatherton concluded this factor would have a significant negative effect on Callie's relationship with her parents should she move to Indiana.

Dr. Heatherton expressed concern with Jill's relatively new marriage and the fact that she and Kitzke had yet to establish themselves as a new family. He also noted that because Callie had in the past demonstrated oppositional behavior, she may do so again given the transition. Dr. Heatherton believed that during the period of adjustment to the new family, Callie's relationship with her father would be affected. Although Jill suggested allowing more frequent phone contact and the possibility of opening an e-mail account for Callie, Dr. Heatherton stated that phone calls and e-mails do not "fulfill the need for nurturance and human touch" and given Callie's age, such communication will lack the " 'rich' interaction and detail provided by seeing her father."

Dr. Heatherton acknowledged that remarriage often alleviates economic problems experienced by custodial parents in divorce. However, other stressors are associated with remarriage and reloca-

tion. Because Jill and Kitzke could expect some adjustment difficulties due to their employment, this would affect their relationship with Callie. He further noted that transportation and employment demands would affect Jill's ability to transport Callie and thereby affect Callie's visitation with her father. In fact, one such problem had already occurred. Kitzke informed Dr. Heatherton that he planned to leave work for Springfield on April 16, 2004, at noon but a crisis kept him there until 7 p.m.

Dr. Heatherton noted that Callie was very attached to both her mother and father. He expressed concerns that Kitzke commented that he did not have his own children, although such statement is not uncommon by a stepparent. Dr. Heatherton concluded that Kitzke's view of Callie will play a part in the degree to which he becomes attached to her and will, in turn, affect Callie's adjustment.

Dr. Heatherton's report did not issue a recommendation of whether it was in Callie's best interests to move to Richmond, Indiana, because the trial court did not request such a recommendation. In his report, at the court's request, Dr. Heatherton stated that the move would have a "significant effect" on Vincent's relationship with Callie. At trial, he stated that this "significant effect" would be negative.

Vincent testified that he was a safety-education officer and public-information officer with the Illinois State Police (ISP) and had been employed by ISP for eight years. He exercised his visitation, attended parent-teacher conferences, and often had lunch with Callie at her school.

Vincent described some of the problems he and Jill had experienced. Vincent claimed that Jill only occasionally gave him information concerning Callie's school, such that Vincent had to contact Callie's teacher directly to get information. He and Jill communicated mostly by notes in Callie's backpack. Jill did not tell Vincent that she placed Callie in therapy with Swenny until a month after doing so. According to Vincent, Jill occasionally interfered with his telephone calls with Callie or would not be home during his scheduled time to call. Jill also allegedly scheduled activities for Callie during Vincent's visitation time.

Vincent expressed his concerns about Callie moving, including concerns about her being on the road for the approximately five hours it would take to travel to Springfield for visitation. Also, the move would not only affect Vincent's relationship with Callie but would affect Callie's relationship with her extended family members, including Vincent's sister and brother-in-law (and their children) in New Berlin, Illinois; Vincent's mother in Fairfield, Illinois; Vincent's grandmother in Charleston, Illinois; and Jill's parents in Springfield. Vincent

expected Callie would participate in athletic activities in school. He expressed concern that he would rarely be able to attend these events and that the activities would affect his visitation. Vincent's sister and mother also testified as to their relationship with Callie and Vincent's "exceptional" relationship with Callie.

Jill testified at the hearing as an adverse witness during Vincent's case and on her own behalf. Jill owned her own crafting business, which she described as a very flexible job. She believed that flexibility would continue in Indiana.

Jill admitted that Callie and Vincent had a loving relationship. While she acknowledged that the move would affect that relationship, she did not think it would be adverse depending upon the quality of the time Vincent and Callie spent together. She denied not providing information to Vincent.

Jill admitted neither she nor Kitzke had extended family in Indiana. She had not yet decided which school Callie would attend if Callie moved to Indiana. Jill did not consult with Vincent on the issue of Callie's schooling, despite being required to do so by the court's custody order.

Jill described the cultural activities available in Richmond and the house in which they would live. According to Jill, not moving would have a negative impact because she could not afford to live in Illinois while her husband lived in Indiana. Although she currently lived with her parents, she could not do so long-term. Living apart from her husband was difficult on their relationship. In addition, Jill was pregnant and due to give birth in December 2004.

Jill believed the move would benefit Callie because they would be together as a family and be more financially sound. She proposed visitation of every third weekend, including any long holiday weekends, every school holiday, division of Christmas, alternative Thanksgivings, and 7½ weeks in the summer. She agreed to mail school information to Vincent, videotape school activities, and establish an e-mail account for Callie.

Kitzke testified that he had a bachelor of arts degree from the University of Notre Dame in government international relations. He was currently employed by Auto Car Corporation as a quality manager and earned $60,000 a year. Prior to accepting the employment with Auto Car Corporation in October 2003, Kitzke had been unemployed for six months. His previous employment was as the quality manager for Blue Bird Wanderlodge, a company that builds motor homes, in Fort Valley, Georgia. He had worked in what he described as the "quality profession" for almost 15 years. He also described his unsuccessful efforts to find employment in Illinois.

According to Kitzke, he had a good relationship with Callie. He testified that the impact on him if Callie was not allowed to move to Indiana would be that he would feel unable to provide for his wife and Callie and that it would cause an emotional and financial strain on his relationship with Jill.

Swenny testified on Jill's behalf. He initially saw Callie in March 2003 at Jill's request for behavior problems. He met with Vincent once, at Vincent's request, because Vincent wanted to know what Swenny was doing in therapy with Callie. Vincent did not report the same level of problems with Callie as reported by Jill. Swenny saw Callie approximately weekly until January 2004 and then again in March 2004 because Jill was worried about how these proceedings would affect Callie.

Swenny concluded that Callie seemed able to handle new situations better than typical children her age. He expressed the opinion that it would not be negative for Callie to move. On cross-examination, he admitted that he could not give an opinion as to how the move would affect Callie and Vincent's relationship because he did not know anything about Vincent. He also admitted never having met with Kitzke.

On July 1, 2004, the trial court entered its order on the petition for permanent injunction. In its order, the court expressly found that section 13.5 of the Parentage Act (750 ILCS 45/13.5 (West Supp. 2003)) required Vincent to establish, by a preponderance of the evidence, that removal of Callie was not in her best interests. After reviewing the evidence, the court held as follows:

"If the court were only to consider what is in the best interests of Callie Fisher, the court would conclude that it is not in the best interests of Callie that she be removed from the State of Illinois. The move from Springfield, Illinois[,] to Richmond, Indiana[,] will separate Callie from a parent with whom she has a close, loving relationship; she will be removed from the home in which she has been raised since shortly after her birth; her contact with her extended family, with whom she has a close relationship, will be substantially curtailed; she will move to a location where she has no extended family or friends; she will be subjected to a difficult commute in order to visit her father and other extended family members; she is moving to a community that does not have the resources that Springfield has; and strained communications between two parents (which the court attributes to each parent) will become almost impossible. The court also has substantial concern about how Callie will be cared for in Richmond when [Jill] is away from home for her craft shows[,] which are her livelihood. The court has substantial concerns about the nature of the relation-

ship between Callie and Mr. Kitzke. By virtue of this [o]rder[,] Callie will have to go through a period of adjustment with a new step[ ]parent in her home as well [as] a period of adjustment to a new community, in a new school, meeting new friends, all of which will have to be accomplished without her father or her extended family with whom she is very close and on whom she relies for emotional support. *** It is a finding of this court that one of Jill's motives to marry and move away from Springfield was to separate herself from [Vincent]. This court also finds [Vincent] is partly responsible for this result based upon his conduct towards Jill."

The court further found that the opinions expressed by Dr. Heatherton were valid and rejected the opinions expressed by Swenny, as his were reached without knowing anything about Vincent and knowing little about Kitzke and based on Callie's excitement about a new house immediately after visiting Richmond. Nonetheless, the court found that the indirect benefits to Callie required a denial of the injunctive relief. Specific benefits included Kitzke holding a well-paying job in Indiana and Jill's pregnancy. The court expressed concern that if the injunction were granted, the baby would be separated from his/her father. The court believed this benefit to Jill would indirectly benefit Callie and was sufficient to warrant a denial of Vincent's request for injunctive relief. The court allowed removal and set a visitation schedule.

On Vincent's motion to reconsider, the trial court reiterated its belief that the move was not in Callie's best interests but that the court was required to consider the indirect benefit to Callie through Jill. In denying the motion to reconsider, the court recognized those indirect benefits as Jill being able to live with her husband and that Jill's financial circumstances would improve. This appeal followed.

## II. ANALYSIS

Vincent raises two issues on appeal. First, he argues that the trial court erred by denying his petition for permanent injunction, improperly placing on Vincent the burden of proof to establish that removal was not in Callie's best interests rather than applying the injunction standard, and by going beyond the issue before it and permitting removal. Second, Vincent argues that even if the court properly considered the removal issue, the evidence established it was not in Callie's best interests to be removed from Illinois. Although Jill did not file a brief with this court, the claimed error is such that we can decide this appeal on the merits without the aid of Jill's appellee brief. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976).

## A. Background of Removal in Parentage Act Cases

■ In cases where the parents of a child were married, section 609(a) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/101 through 802 (West 2002)) authorizes the trial court to grant leave to a custodial parent to remove the child from the state:

"(a) The court may grant leave, before or after judgment, to any party having custody of any minor child or children to remove such child or children from Illinois whenever such approval is in the best interests of such child or children. The burden of proving that such removal is in the best interests of such child or children is on the party seeking the removal." 750 ILCS 5/609(a) (West 2002).

Prior to 2003, the Parentage Act did not incorporate section 609 of the Marriage Act, and therefore, such provision did not apply to unmarried parents. *Harbour v. Melton*, 333 Ill. App. 3d 124, 129, 775 N.E.2d 291, 294-95 (2002); see also *In re Parentage of R.M.F.*, 275 Ill. App. 3d 43, 50, 655 N.E.2d 1137, 1142 (1995) (holding that "[b]ecause the Parentage Act contains no provisions requiring that actions for removal be resolved pursuant to section 609 of the Marriage Act, we find that section 609 of the Marriage Act is not implicitly incorporated into the Parentage Act"). Instead, the noncustodial parent could petition for modification of custody or visitation, which would require a best-interests analysis pursuant to section 602 of the Marriage Act (750 ILCS 5/602 (West 2002)). *R.M.F.*, 275 Ill. App. 3d at 50-51, 655 N.E.2d at 1143-44.

■ In 2003, the legislature amended the Parentage Act to specifically address removal. Pub. Act 93—139, § 5, eff. July 10, 2003 (2003 Ill. Legis. Serv. 1304, 1304-07). In particular, the legislature amended section 14 of the Parentage Act, pertaining to judgments, to provide that "[i]n determining custody, joint custody, *removal*, or visitation, the court shall apply the relevant standards of the [Marriage Act], *including [s]ection 609.*" (Emphases added.) 750 ILCS 45/14(a)(1) (West Supp. 2003). Further, section 16 of the Parentage Act, pertaining to modification, was amended to specifically provide that the trial court had jurisdiction to modify an order of removal and that any removal judgment modification was to be in accordance with the factors specified in the Marriage Act, including section 609. 750 ILCS 45/16 (West Supp. 2003). Finally, the legislature added a new section, which provides, in relevant part:

"(a) In any action brought under this Act for the initial determination of custody or visitation of a child or for modification of a prior custody or visitation order, the court, upon application of any party, may enjoin a party having physical possession or custody

of a child from temporarily or permanently removing the child from Illinois pending the adjudication of the issues of custody and visitation. When deciding whether to enjoin removal of a child, the [c]ourt shall consider the following factors, including, but not limited to:

>    (1) the extent of previous involvement with the child by the party seeking to enjoin removal;
>
>    (2) the likelihood that parentage will be established; and
>
>    (3) the impact on the financial, physical, and emotional health of the party being enjoined from removing the child.
>
>    (b) Injunctive relief under this Act shall be governed by the relevant provisions of the Code of Civil Procedure [(735 ILCS 5/1—101 through 22—105 (West 2002))]." 750 ILCS 45/13.5 (West Supp. 2003).

When determining the legislative intent, a court must first look at the plain meaning of the statutory language. *Long v. Mathew*, 336 Ill. App. 3d 595, 603, 783 N.E.2d 1076, 1082 (2003). The plain meaning of the statutory language evidences the legislature's intent to provide two changes. First, the amendments provide a means by which a noncustodial parent may prevent the custodial parent from removing the child from the state, even before parentage is established, while custody issues are pending. 750 ILCS 45/13.5 (West Supp. 2003); see also 93d Ill. Gen. Assem., House Proceedings, March 13, 2003, at 24 (statements of Representative Fritchey) ("House Bill 1382 deals with the issue of court orders dealing with the removal of a child while there's custody issues pending"). Second, the amendments specifically incorporate section 609 of the Marriage Act, thereby requiring custodial parents to seek leave to remove a child from the state under the standards set forth in section 609. 750 ILCS 45/14(a)(1), 16 (West Supp. 2003). We find that the legislature did not intend to shift the burden articulated in section 609(a) of the Marriage Act (750 ILCS 5/609(a) (West 2002)) to the party seeking an injunction under section 13.5 of the Parentage Act (750 ILCS 45/13.5 (West Supp. 2003)). Had it intended to do so, it would have added a provision similar to that contained in sections 14(a)(1) and 16 of the Parentage Act (750 ILCS 45/14(a)(1), 16 (West Supp. 2003)) specifically incorporating the relevant standards contained in section 609 of the Marriage Act (750 ILCS 5/609 (West 2002)). Consequently, the burden of proving that removal is in the best interests of the child remains with the party seeking to remove the child.

### B. Trial Court's Judgment Was Against the Manifest Weight of the Evidence

■ In this case, Vincent brought his petition for permanent injunc-

tion pursuant to section 13.5 of the Parentage Act. Section 13.5(b) specifically incorporates the relevant provisions of the Code of Civil Procedure. 750 ILCS 45/13.5(b) (West Supp. 2003). To succeed on his petition to enjoin Jill from removing Callie from Illinois, Vincent was required to clearly and affirmatively prove that (1) he had a clear and ascertainable right in need of protection, (2) irreparable harm would result if injunctive relief was not granted, and (3) no adequate remedy at law existed. *Bogner v. Villiger*, 343 Ill. App. 3d 264, 270, 796 N.E.2d 679, 685-86 (2003); *Hoffmann v. Hoffmann*, 59 Ill. App. 2d 459, 461-62, 208 N.E.2d 579, 580 (1965). Section 13.5(a) also sets forth additional factors to be considered by the trial court, including, but not limited to, (1) the extent of previous involvement by the noncustodial parent; (2) the likelihood parentage will be established; and (3) the impact on the custodial parent financially, emotionally, and physically if enjoined from removing the child. 750 ILCS 45/13.5(a) (West Supp. 2003). A trial court's judgment on a permanent injunction will not be reversed unless it is against the manifest weight of the evidence such that the opposite result is clearly evident. *In re Estate of Ramlose*, 344 Ill. App. 3d 564, 573, 801 N.E.2d 76, 83 (2003).

■ In this case, the trial court blurred the distinction between sections 13.5 and 14 of the Parentage Act. Rather than applying the standards for a permanent injunction and applying the factors articulated in section 13.5, the court placed on Vincent the burden of proving that removal was not in Callie's best interests. While the best interests of Callie were certainly a factor to be considered by the court in determining whether to grant the injunction, Vincent was not also required to *prove* that removal would not be in Callie's best interests. See 93d Ill. Gen. Assem., House Proceedings, March 13, 2003, at 24 (statements of Representative Fritchey) ("[House Bill 1382] also mandates the courts always take into consideration the best interest of the child in issuing orders that would restrict removal of a child pending custody issue resolution"). Section 609(a) of the Marriage Act, which was specifically incorporated into the Parentage Act by Public Act 93—139, expressly places the burden of proving removal would be in the child's best interests upon the parent seeking removal. 750 ILCS 5/609(a) (West 2002). However, the trial court did find removal was *not* in Callie's best interests, so its decision to deny the petition for permanent injunction was against the manifest weight of the evidence.

The evidence demonstrated that Vincent had a clear and ascertainable right. Paternity had been established, and Vincent presented extensive evidence about his relationship with Callie. The trial court even acknowledged in its order Callie's close, loving relationships with Vincent and her extended family.

Vincent also established that irreparable harm would result if injunctive relief was not granted. He presented evidence that he and Jill had difficulty communicating and that if Callie were removed, the lack of communication would affect his relationship with Callie given the distance. In fact, the trial court acknowledged that for numerous reasons, it would not be in Callie's best interests to move, including the fact that she would be separated from her father and her extended family and that she would face a difficult commute. The court also found valid the concerns expressed by Dr. Heatherton, which included Dr. Heatherton's concern that Callie's relationship with Vincent would be negatively affected by the move. Vincent also proved he had no adequate remedy at law.

The trial court properly considered the impact the injunction would have on the financial, physical, and emotional health of Jill. See 750 ILCS 45/13.5(a)(3) (West Supp. 2003). The evidence demonstrated that the impact on Jill would be tremendous. Nonetheless, the court still erred in denying the motion for permanent injunction because not only did Vincent prove his entitlement to injunctive relief, the court specifically found removal was not in Callie's best interests.

The trial court supported its denial of the injunction on the basis that the benefits to Jill—being with her husband, which would benefit her financially and emotionally—would indirectly benefit Callie. In *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 527, 791 N.E.2d 532, 548 (2003), the Illinois Supreme Court recognized that because there is a "nexus between the quality of life of the custodial parent and the quality of life of the child," the court must consider the indirect benefits of the move. However, the paramount issue remains the best interests of the child. *Collingbourne*, 204 Ill. 2d at 529, 791 N.E.2d at 549. Any benefit to the quality of life of the custodial parent does not automatically equate to an improvement in the quality of life of the child and will not always be sufficient to warrant removal. *Collingbourne*, 204 Ill. 2d at 528-29, 791 N.E.2d at 548-49. Further, the court should not limit its examination solely to the financial enhancement to the custodial parent but must also consider noneconomic factors that would contribute or detract from the well-being of the custodial parent and the child. *Collingbourne*, 204 Ill. 2d at 528, 791 N.E.2d at 548-49.

Despite finding an indirect benefit to Callie, the trial court never stated that due to such benefit, it was in Callie's best interests to be removed from Illinois. Instead, the court stated that the indirect benefits required the court to deny the injunction, that such benefits warranted denial of the injunction, and that the indirect benefits favored a denial of the injunction. Because the court found it was not

in Callie's best interests to move, and because the evidence established that Vincent proved he was entitled to a permanent injunction, we reverse the court's denial of Vincent's petition for permanent injunction.

We also reverse the trial court's judgment granting permission to Jill to remove Callie from Illinois. No petition for removal was pending before the court, and the court did not require Jill to prove removal was in Callie's best interests. Because the court was without authority to grant permission to remove Callie from Illinois, its judgment doing so must be reversed. This decision does not, however, preclude Jill from filing a petition to remove upon remand.

## III. CONCLUSION

For the reasons stated herein, we reverse the trial court's judgment denying the petition for permanent injunction and granting permission to Jill to remove Callie. The cause is remanded with directions to grant the petition for permanent injunction.

Reversed and remanded with directions.

STEIGMANN, J., concurs.

JUSTICE McCULLOUGH, dissenting:
Vincent is not entitled to a permanent injunction order.

I disagree that there has been proof entitling the entry of an injunction order. The trial court, in its five-page detailed order, did consider the involvement of the noncustodial parent and the impact on the custodial parent financially, emotionally, and physically if enjoined from removing the child.

I do agree with the majority that the proper method to determine the merits of the child's moving out of the State of Illinois is controlled by section 609 of the Marriage Act.

The trial court did give serious and thoughtful consideration in making its ruling and did consider the factors set forth in section 13.5(a) of the Parentage Act. Section 13.5 permits an injunction against any party having physical custody of the child from removing the child "pending the adjudication of the issues of custody and visitation." 750 ILCS 45/13.5(a) (West Supp. 2003). The factors set forth in sections 13.5(a)(1) and 13.5(a)(3) are proper considerations in determining the best interest of the child. It is clear from the trial court's order it did adjudicate the issues of custody and visitation.

As pointed out by the majority, the Parentage Act, amended effective July 10, 2003, incorporated section 609 into Parentage Act

removal cases. The issue of best interests of the child was not addressed by the court in the context of section 609.

In sum, this court should not enter a permanent injunction but should remand this case to the trial court to consider the best interests of the child, Callie, as required by section 609.

Hopefully, Callie will not get lost in our cumbersome, but sometimes necessary, judicial system.