2021 IL App (1st) 201230-U

SIXTH DIVISION
August 6, 2021

No. 1-20-1230

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| VANESSA VILLARREAL, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 D 79984 |
| | ) | |
| ANTHONY MEDINA, | ) | The Honorable |
| | ) | Matthew Link, |
| Respondent-Appellee. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where the trial court's application of certain factors in considering whether relocation would be in the best interests of the minor child was against the manifest weight of the evidence, its denial of the mother's motion for permission to relocate is reversed.

¶ 2    Petitioner Vanessa Villarreal and respondent Anthony Medina have one minor child together. Before us on appeal is the trial court's denial of Vanessa's motion to relocate with the child to Fremont, California. Vanessa asks us to reverse, arguing that the trial court's judgment was against the manifest weight of the evidence. For the following reasons, we agree and reverse the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4      Vanessa and Anthony were never married, but had one child together, Diego, on August 4, 2014. Anthony is also the father, with two of his prior partners, of Diego's three half-siblings.

¶ 5      On August 7, 2017, Vanessa and Anthony entered into an agreed judgment allocating parental responsibilities and parenting time for Diego. They agreed that Vanessa would have sole decision-making power as to all issues regarding Diego except for extracurricular activities, for which the parties would share decision-making power. Vanessa was also designated as the primary residential parent. Anthony was given parenting time on Monday evenings, Thursday overnights, and alternating weekends, and he was to pick Diego up from daycare and drive him to Vanessa's on Tuesdays and Wednesdays.

¶ 6           A. Vanessa's Petition to Relocate Diego to California and for Child Support

¶ 7      Pursuant to section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2 (West 2018)), on April 18, 2018, Vanessa petitioned the court for leave to relocate with Diego to her hometown of Fremont, California. In another motion, filed at the same time, Vanessa also sought temporary and permanent child support from Anthony. In her petition, Vanessa alleged that she had been "offered several opportunities for advancement" with higher salary potential than what she currently had "should she decide to transfer" to her company's headquarters in San Francisco. She alleged that she had been unable to find comparable employment opportunities in Chicago.

¶ 8      Vanessa alleged that Anthony had few extended family members living in Chicago, and that his family's involvement with Diego was minimal. Diego was enrolled in daycare for $325 per week, an expense shared equally by Vanessa and Anthony. But because Vanessa had a significant support system in Fremont, California—approximately 15 close family members,

including her retired father, who was willing to care for Diego on a full-time basis—babysitting and childcare expenses for Diego would be minimized by the relocation. Vanessa said that the school Diego would attend in Fremont, Weibel Elementary School, was "at least equal if not better than" the public school options in Chicago. In addition, Vanessa alleged she was "eager to facilitate a close relationship" between Anthony and Diego, and would compensate for the relocation by allowing visitation "during all major holidays, winter break, spring break, and a portion of the summer." Vanessa stated that Anthony would be welcome to visit Diego in Fremont and would be able to communicate with him by telephone and video call. She would also continue to facilitate Diego's relationships with his half-siblings.

¶ 9 Vanessa concluded her petition by explaining that she wanted to relocate with Diego because it would allow her to both work at her company's headquarters for a higher salary and greatly reduce or eliminate childcare costs, making it possible for her to provide Diego with a significantly better quality of life. Vanessa said that she wanted to move "primarily based on increased financial security, familial support, and improved educational opportunities" for Diego.

¶ 10 In his *pro se* opposition to the relocation, filed on May 25, 2018, Anthony responded that it was in Diego's best interests to remain in Chicago because Anthony's business had not interfered with the time he spent with Diego, he would "love to have more night stays" with Diego, he picked up Diego from daycare four days per week, and his mother and sister had provided childcare for Diego until Diego was two years old. Anthony also alleged that "[a]ny changes [would] be emotionally damaging" because Diego had relationships with his three-half siblings. Anthony maintained that Diego had "extended love and support from Anthony's massive family," and that each level of the house Anthony lived in was occupied by relatives. Anthony also said that Diego had a "wonderful" relationship with his stepmother, Jackie, who Anthony had married in

November 2017. Anthony alleged his family had provided support in the past and could do so again in the future.

¶ 11     Anthony later retained counsel and filed an amended answer to Vanessa's petition in which Anthony additionally asserted that Vanessa's higher earnings in California would not result in a net benefit to her because of the higher cost of living in California. In his amended answer, Anthony acknowledged that he had only eight overnights per month with Diego but said that he "consistently [saw Diego] five (5) days per week and ensure[d] that his parenting time between [Diego], and his three (3) older children *** all [took] place at the same time." Anthony disagreed with Vanessa's assertion that he had few extended family members living in Chicago, arguing instead that, even though his parents were deceased, he still had "a large extended family of over 50 family members" in the area.

¶ 12     On August 20, 2018, the trial court appointed Joseph Taconi as the guardian *ad litem* (GAL) in this matter.  On October 1, 2018, the trial court entered a uniform support order requiring Anthony to pay $867 in child support each month and to pay Vanessa $4335 in retroactive support for April through September 2018.

¶ 13          B. The GAL's Recommendation to Let Vanessa Relocate With Diego

¶ 14     In his February 11, 2019, written recommendation on the relocation petition, the GAL concluded that Vanessa should be allowed to relocate Diego to Fremont, California. The GAL stated that he had visited both parties' homes, traveled to California to visit the home of Vanessa's parents—where she would initially live if permitted to relocate—and looked at potential residential options in that area. The GAL noted that both Vanessa and Anthony had "neat and clean" homes and Diego had his own room at both. Vanessa's parents' house in Fremont was "a ranch style building located in an upscale neighborhood" located only a short distance from the grammar and

middle schools where Vanessa intended to enroll Diego.

¶ 15    The GAL then discussed each of the factors in sections 602.7 and 609.2 of the Act governing allocation of parental responsibility decisions (750 ILCS 5/602.7(b) (West 2018)) and relocation decisions (750 ILCS 5/609.2(g) (West 2018)). As to the parents' wishes under section 602.7, Vanessa obviously wished for Diego to relocate to California while Anthony wanted Diego to stay in Chicago. Consideration of Diego's own wishes was not relevant, as he was only four years old and had "limited maturity and ability to express reasoned, independent preferences." The GAL found Vanessa's assertions to be "more credible," although he said Anthony's were "not incredible." He noted that Diego seemed to be closer to and rely more on Vanessa. He acknowledged, however, that both parents had been involved in Diego's upbringing and had a good relationship with him. The GAL said that Diego seemed well adjusted to being with both parents in either of their current neighborhoods, and that everyone involved was in good physical and mental health. Noting that at present the distance between Vanessa's and Anthony's homes was minimal, the GAL suggested that if relocation were granted, Anthony should be allowed substantial parenting time and both parents should be responsible for the cost of transportation. Finally, the GAL concluded that each parent was willing and able to place Diego's needs above his or her own and to facilitate and encourage a close and continuous relationship with him.

¶ 16    Addressing the factors in section 609.2 of the Act, the GAL noted that Vanessa wanted to relocate because it would provide Diego with a safer neighborhood and better schooling, they would live with Diego's grandparents, there would be no daycare costs, Vanessa had a reliable support system to help her care for Diego, and Vanessa would have opportunities to advance her career. Fremont, California, had been ranked as the top location to raise a family in California in September 2017. The GAL noted that Vanessa's current employer had offices in the Fremont area

and had advised her that it would attempt to place her in a similar position to her present one. Also, the neighborhood had less violence and better educational opportunities than the areas in which Diego was living in Chicago.

¶ 17     The GAL found that both parents had a quality relationship with Diego and both of their positions were credible. It was "clear" to him, however, that Vanessa and Diego were well-bonded and that "[Diego] appear[ed] to be closer to [Vanessa] than [Anthony]." As to the existing and possible future educational opportunities, the GAL noted that if Diego relocated to Fremont, he would attend a school close to where he would be living that was "neat and clean" and "rated as a quality educational institution." For the presence or absence of extended family, the GAL noted that Vanessa, as the primary residential parent, had no family in Chicago but in Fremont would have her parents, with whom she and Diego would live, and who were healthy and capable of helping her to raise Diego. Anthony had his wife and a brother in the Chicago area, as well as his other three minor children. The GAL "d[id] not foresee any substantial adverse impact on [Diego] if relocation occurred."

¶ 18     In his examination of the question of whether the court could fashion a reasonable allocation of parenting time, the GAL responded emphatically: "[t]he answer to the question is yes!" Finally, the GAL concluded that any impairment to Diego's relationship with Anthony could be "minimized by allowing [Anthony] substantial parenting time."

¶ 19     The GAL recommended that Vanessa be allowed to relocate to Fremont and that she should have sole responsibility for decisions relating to Diego's education, health, and extracurricular activities, "so long as Diego's participation in said activities [did] not substantially affect [Anthony's] parenting time." Anthony should have parenting time whenever he visited California plus seven weeks of parenting time in the summer in Chicago, travel costs should be split equally

between the parties, and the parent who was not with Diego should have daily contact with him.

¶ 20                                          C. The Trial

¶ 21    A three-day trial was held in this matter in September and October 2019. The court heard from Vanessa; her parents, Humberto and Leticia Villarreal; her friend Amelia Rodriguez; Anthony; his half-sister Dana Rose Mischke; his aunt and godmother Irma Medina; his half-brother Anthony Fuentes; his wife Jacqueline (Jackie) Medina; and the GAL.

¶ 22                                      1. Vanessa Villarreal

¶ 23    Vanessa testified that at the time of trial she managed a sales office in Chicago for a tech company called FinancialForce.com, which had its corporate headquarters in San Francisco, California. Vanessa, who was born in Fremont, California, and had lived there until she was approximately 21 years old, still had around 25 relatives living in that area, including her mother and father, her brother and his two children, her aunt, and a number of cousins.

¶ 24    Vanessa explained that she and Anthony had begun their relationship in 2012, when Vanessa still lived in California, but had broken up due to the distance. In 2013, Vanessa moved to Chicago, and because she was unable to find an apartment, she stayed with Anthony. Sometime around December 2013, Vanessa learned she was pregnant, and she and Anthony decided to try and make their relationship work. Diego was born on August 4, 2014.

¶ 25    Vanessa said that around the time Diego turned one, she had a hunch that Anthony was cheating on her. They argued, and Vanessa said she felt at the time that she was being "left alone *** taking care of his [older] kids and making sure that [her own] son was taken care of." The two broke up in July 2016. Vanessa testified that although the breakup was "devasting" for her, she continued to live with Anthony for another six months while she figured out what she would do next. In December 2016, Vanessa said that she was very seriously considering moving back to

California. She testified that she had a heart-to-heart with Anthony, that he agreed to the move, but that she said "seeing [Anthony] in tears" made her decide to give coparenting in Chicago a shot. According to Vanessa, Anthony was happy with this choice and said he would be helpful and have Vanessa's back. She made clear to him that she had agreed to the arrangement on a trial basis and that if she was "still feeling alone" then her "answer [would] probably be the same." Vanessa said that Anthony told her he understood and would " 'never hold [her] and Diego back.' "

¶ 26     In January 2017, Vanessa's father came to Chicago to help her move to her own place in Chicago. Vanessa testified, however, that as soon as her dad left, her coparenting relationship with Anthony was "nothing like what he had said that it would be." In the beginning, Anthony did not provide any financial support to her or Diego and Vanessa had to pack everything for Diego when he went to Anthony's, including diapers and wipes.

¶ 27     Vanessa said that although she and Anthony did not have a written schedule in place until August 2017, they essentially mimicked the schedule Anthony had with his other children. And although Vanessa agreed that Anthony did not miss his days with Diego, she described communicating with him as difficult. By the time Diego started daycare at age two they were following the schedule in their agreed allocation judgment. Anthony had eight overnights with Diego per month (96 per year). Vanessa was the one who suggested that Anthony pick Diego up from daycare on his non-visitation days because she "wanted to make sure that [Diego] s[aw] his father every single day." Vanessa also said that Anthony was not always on time for pickups, occasionally forcing Vanessa to leave work early.

¶ 28     Anthony became engaged to Jackie approximately two months after Vanessa and Diego moved out, and the two were married in November 2017. Vanessa testified that her relationship with Jackie was not good, that they were "not on speaking terms," and that her experience with

Jackie had been "very hostile." Vanessa said the coparenting relationship was not working because the "communication wasn't really there." Although Anthony's two half-brothers and sister-in-law occasionally picked Diego up from school, Anthony's sister who lived less than a 10-minute walk from the school was not available or had not offered to assist with childcare.

¶ 29 Vanessa acknowledged that the coparenting relationship had improved over time and that she, Anthony, and Jackie had recently held a combined fifth birthday party for Diego. But she said:

"We're talking about three years of him saying that he was going to be there for me and our son, and that first year of 2017 was a complete disaster. I never want to repeat that year in my life. I was alone. I didn't have anyone to turn to. Could not count on him. He was too busy proposing to his wife, taking trips with his new wife and, you know, just being absent in terms of communication and when I told—I told him let's see how it works in six months. You would think he would be on his best behavior for six months in trying to facilitate a coparenting relationship. That was absent. So I had to deal with that for a long time."

¶ 30 Vanessa said that she was concerned about the safety of the neighborhood schools where she and Anthony lived, which she said were "graded like F." She was happy when Anthony said he was going to enroll Diego at A.N. Pritzker School, a good school that two of Anthony's other children attended that was located just down the street from Anthony's grandmother. Vanessa agreed on cross-examination that Anthony told her he would be responsible for all school drop-offs and pick-ups, but stated that she did not believe him because his job installing tile required him to be all over the Chicagoland area.

¶ 31 In Fremont, Vanessa said, she would have a strong support system. Her retired father would walk Diego to and from school, eliminating the need for before- or after-school care. And

Vanessa's mother worked for the same school district and would be nearby if Diego needed anything. Vanessa described the school in Fremont as "really a good school," and believed Fremont would be "a great place for Diego to learn and thrive; but along with that comes safety." Vanessa said that if they moved to Fremont, she would "hopefully" transfer to her current employer's corporate office in San Francisco and would ask to work from home one day per week. Vanessa also said that, to facilitate Anthony's relationship with Diego if they moved, she would visit Chicago occasionally for a weekend or a week in addition to any scheduled time Anthony had with Diego. Vanessa testified that she would make sure Diego had his own iPad to communicate with Anthony daily "because I honestly feel, like I felt before, that he needs to communicate with [Anthony] every day." And Vanessa also mentioned that Anthony and Jackie would be welcome to stay at her family's home in Fremont if they were to visit and Anthony could have the same 96 overnights that he enjoyed with their current parenting schedule.

¶ 32    Vanessa said that she believed Anthony was a good dad who loved his children but she did not believe his children were his top priority or that he was able to provide them with adequate emotional support. She also agreed that her opinion of Anthony changed once they broke up "[b]ecause his demeanor completely changed as a father." He became distracted with other women in his life and "his kids came second."

¶ 33                                  2. Vanessa's Parents

¶ 34    Humberto and Leticia Villarreal, Vanessa's parents and Diego's only living grandparents, lived in Fremont, California, and had been married for 42 years. Humberto was retired and Leticia worked for the school district, where Diego would attend school if he moved to Fremont.

¶ 35    Humberto testified that he helped Vanessa move to Chicago in November 2013, then helped her move out of Anthony's in January 2016. Humberto said he believed that Anthony, as a

father, was "responsible," "good," and "hard-working," but that he had "a lot on his plate" and that, between his new wife, his three other children, and the mothers of his other children, in addition to Diego, it was all "too much for him". Leticia said that when she met Anthony, she thought "he was a nice guy, kindhearted." But Leticia was very close with Vanessa, talking daily via phone calls or text messages, and said Vanessa "struggle[d]" with her life in Chicago: "I know that she is not really happy. She doesn't have the support that she should have." Leticia said that Vanessa, who had no family in Chicago, had no one to call when she was "[i]n a bind."

¶ 36    Humberto and Leticia testified that on spring and winter breaks in 2017 and again in 2018, they flew to Chicago to help Vanessa care for Diego when his daycare was closed. Both said the main reason for those visits was to provide childcare and not simply to visit with Vanessa and Diego.

¶ 37    Humberto said he thought Vanessa and Diego should move to Fremont because Vanessa "is so by herself" in Chicago: "She has nobody, absolutely nobody, and our family circle is really tight. We have family all over California." Humberto testified that in Fremont there was family nearby, "all close within three miles from each other, you know, if something happens," and that Vanessa and Diego could stay with Humberto and his wife until Vanessa was able to get "settled." As to Anthony's family, Humberto felt that they lived "kind of" far away and they were "not too cooperative to help out." Leticia thought it was important for Diego to move to California for "family support, education, the crime, safety, *** job opportunities for Vanessa." The Fremont family was very close-knit and got together on a weekly basis.

¶ 38    Humberto said the school Diego would attend was within walking distance from their house, he could pick Diego up from school, and all the schools in the area were top-rated. In Chicago, Diego's school was not close to Vanessa's home and he worried about her travelling with

him through the snow in the winter. Leticia had visited Pritzker, the school Diego had just started attending in Chicago, and said it was a good school. Like Humberto, however, she was concerned that the school was not close to Vanessa, and Anthony worked "all over the place," making drop-offs and pick-ups more difficult, and requiring before- and after-school care. Leticia testified that the school Diego would attend in Fremont was highly rated, had a "vigorous" curriculum, and had a variety of extracurricular programs.

¶ 39    Humberto and Leticia were also both concerned with Vanessa's and Diego's safety. The first time they visited Vanessa and Diego in Chicago, they heard multiple gunshots nearby at 4 a.m. They worried that Vanessa had no one to help her in an emergency.

¶ 40    Humberto and Leticia said that they would "make it as easy as possible" for Anthony to visit and communicate with Diego and would do "whatever it [took]" to facilitate Anthony and Diego's relationship because Anthony was the father of their grandson. Humberto also said that he would take Diego to visit Anthony as well.

¶ 41    On cross-examination, Humberto disagreed with Anthony's lawyer's suggestion that he viewed Diego moving to California as a punishment for Anthony not trying harder to make things work with Vanessa, saying, "[i]t's not a punishment. That's the place where it would be best for Diego. I'm not even thinking about Vanessa or Tony. I'm thinking where would be the best place for Diego to become a better man."

¶ 42    A letter Humberto and Leticia wrote to the GAL on November 2, 2018, after the GAL's visit to Fremont, was admitted as evidence. In addition to mirroring much of what was in their trial testimony, in the letter the Villarreals noted that Diego video-chatted with his California cousins weekly and had "become very close" with them. The Villarreals described Fremont as a "very safe suburban city with many friendly and family-oriented people in the community" and a place where

children could play outside without fear. They impressed upon the GAL that Diego was "intelligent" and "curious" and needed "to attend a school that positively challenge[d] him and foster[ed] his love for learning." They said that the Fremont schools "have ranked the highest best schools in California," and Weibel Elementary in particular was graded an "A" and ranked #480 out of the 5881 best public elementary schools in California. The high school Diego would attend—Mission San Jose High School—had also received an "A+" grade and was ranked #6 out of the 1334 of the best college prep public high schools in California.

¶ 43    The Villarreals concluded by stating:

"Diego is an extremely smart, intelligent, imaginative and energetic little boy who needs to be challenged and given the best environment in order for him to excel and reach his maximum capacity. This Halloween, he didn't want to be a superhero or anything like that; He wanted to be an astronaut because he said he wanted 'to reach the stars.' We were so wide-eyed that, at the age of four, he came up with that on his own. We just know the great potential that our grandson has. We just know that he can reach that potential if given the chance to grow up in the San Francisco Bay Area. The Bay Area has so much to offer him. *** We want Diego to have the best education and will encourage higher education options. We honestly feel that the best chance for a child to succeed is by putting him in an equitable playing field with many opportunities for growth. Looking at what his options are, we truly feel that the relocation to California will be extremely critical for his development and well-being.

As Diego's grandparents we commit to help assist in the upbringing of Diego. We love and adore him just as much, if not more, than he loves his grandpa and grandma. We've been in his life from the minute he was born. We promise to provide a warm,

nurturing, and loving home environment, as well as provide as much support as possible for our daughter and grandson."

¶ 44                                    3. Amelia Rodriguez

¶ 45    Amelia Rodriguez, Vanessa's friend and roommate, testified that she had known Vanessa for 12 or 13 years and had lived with her in Chicago for 2 1/2 years. Amelia described Vanessa's life as "chaotic," "stressful," and "unhappy" because she lacked "a reliable support system." Vanessa did not receive enough support from Anthony because, in Amelia's opinion, Anthony had "a lot of other priorities in his life." Amelia did not think much of the arrangement between Vanessa and Anthony after they broke up, viewing it as "more her pushing the co-parenting rather than him pushing for it or wanting to work together." Amelia described Anthony as "unreliable" and said that he was not good at communicating with Vanessa about when he was going to pick Diego up. Amelia was also aware that Vanessa had received no financial support from Anthony for the first year that Amelia and Vanessa lived together. Amelia helped out with Diego when she could but believed that Vanessa's reasons for wanting to move to California were justified.

¶ 46                                    4. Anthony Medina

¶ 47    Anthony testified that he owned his own tile business, his schedule was "somewhat" set, and he could manage his schedule based on his life needs. He owned a bungalow-style house with six bedrooms, so each of his children could have "their own space and privacy." Anthony said that he and his siblings did not grow up with their fathers around, and that as a result, his "sole purpose in life is to be there as much as [he] can for all [of his] children." At the time of trial, his three older children were 14, 13, and 12 years old, while Diego was 5. Anthony testified that he had a good relationship with each of his children's mothers. He scheduled his parenting time so that the kids could be together, and they were "very close."

¶ 48    Anthony testified that of his nine half- or step-siblings, five lived in the Chicagoland area and most had children of their own. His family spent time together "all the time." Anthony said that he had a lot of nieces and nephews, there were birthday parties "almost every other weekend," and that hardly a weekend went by where something was not being celebrated. According to Anthony, Diego was frequently a part of these gatherings, and Vanessa herself sometimes attended. Anthony said that his family was "as close as they come." Anthony's mother and sister had watched Diego for the first two years of his life and Anthony said, "I can call on any one of my family members and I'm sure they would say just bring him to me, you know, whatever you need." Anthony also pointed out that Vanessa was good friends with two of his cousins and with his brother's wife. Anthony said his family was "[a]bsolutely" willing to help. Anthony provided an example recently when Diego was sick at school and his sister Dana went to pick him up. Anthony said that Vanessa need only call him if she needed something—"if there's anything that she ever needs, whether she's going to hang out with some friends on a weekend that's her weekend, or she has plans or something outside of being able to bring Diego, she knows that all she can do is call me and if I'm not doing anything, which normally I'm just doing things that are kid-friendly, she knows that I'm willing and able."

¶ 49    Anthony testified that Jackie and Diego would play, bake, and read together, "[e]verything that you can think of that a stepmother would be involved. She helps them with homework. Just countless things."

¶ 50    Anthony testified that Diego had started kindergarten at Pritzker, and that Anthony's daughter was in eighth grade and his son in seventh grade at that school, which they had both attended since kindergarten. Anthony said it was not the school his children were "supposed" to go to residence-wise because when he purchased his house, it removed him from that school's

neighborhood, "but since they have the two siblings they allowed [Anthony] to enroll [Diego]." Anthony had nothing negative to say about the school, he thought the teachers went "above and beyond," and that the community was also very involved. Anthony said that he had offered to Vanessa to avoid before- and after-school care on the days he had Diego to minimize the cost, and had asked for more overnights with Diego, but that Vanessa had refused.

¶ 51 Anthony told the court:

"[T]his is the hardest thing I have ever had to deal with. I feel losing my son would make me incomplete, you know. I want to be there if he has a recital at school. I don't want to watch it on a video, on social media. I want to be there physically for him."

I want to be able to teach him sports and take the training wheels off of his bike, and I just want to be able to continue to love him and provide for him and provide the resources that I as a child never had, you know. I did not have a father growing up and it just makes me want to be there even more for my kids."

¶ 52 At the time of trial, Anthony saw Diego on Mondays, Thursdays, Friday mornings, and Saturdays and Sundays when he had him for the weekend. When Diego started kindergarten, Anthony no longer picked Diego up to drive him to Vanessa's on his non-visitation days. Anthony said his family was his support system, they relied on each other and loved each other, and that extended to Vanessa because she was the mother of his son.

¶ 53 On cross-examination, Anthony acknowledged that during these proceedings he had been ordered to pay $867 in child support per month in addition to retroactive child support totaling $4335. He admitted he was not current on his child support obligation and did not cover health insurance for his children. When asked if he realized that he would have the same number of overnights with Diego if Diego were relocated, Anthony responded, "[w]ell, the 96 still isn't

enough. I still want more time with my kid." But he also admitted that at that time he had not filed any petition for more parenting time.

¶ 54                                    5. Jacqueline Medina

¶ 55    Jackie Medina, Anthony's wife, testified that she and Anthony had been involved off and on since 2010 and were married in November 2017. Jackie said that she had a relationship with Anthony's children from the very beginning and that Anthony always spent a significant amount of time with his children. Since marrying Anthony, Jackie said she had assisted with pick-ups and drop-offs for the older children, but she was not permitted to pick Diego up from daycare because Vanessa had said she did not want Jackie picking him up.

¶ 56    Jackie said she believed she had a great relationship with the children, "[a]bsolutely I love those kids," and that she loved Diego "so much." Jackie testified that the children also had a "great" relationship with each other and that they did a lot of activities together as a family, playing basketball or volleyball at home, baking, going to the park, and taking bike rides.

¶ 57    Jackie agreed that Anthony's job required him to go "all around Chicago and the north suburbs," but said it did not interfere with his parenting or visitation schedule. Jackie estimated that Anthony had "50 plus" family members in the Chicago area and they regularly got together at Anthony and Jackie's house and at Anthony's grandma's house for birthday parties, graduations, and holidays. Jackie said that since they had moved into a house with a porch and backyard they had gatherings there "at least twice a month" with Anthony's brothers, sister, aunts, uncles, cousins, nieces, nephews, grandmother, and friends. Jackie said she respected Vanessa and had no ill will toward her at all, she respected the fact that Diego was Vanessa's son, and that this did not make Jackie love Diego any less.

¶ 58    Jackie said if Diego were relocated to California, "[a]bsolutely it would have an impact on

[her]." Jackie said that she had built a relationship with him since he was two and it had been "wonderful," so it would be emotional and hurt her if he relocated because "[she] love[d] that little boy." Jackie testified that she wanted to continue to see Diego regularly according to the schedule that had been established. She did not think relocation would be beneficial for Diego. Jackie said that she felt "lifting Diego from his home in Chicago would be detrimental not just to [Anthony] but to him. *** I think psychologically it might hurt him—it will hurt him."

¶ 59                                6. Anthony's Family

¶ 60    Anthony's half-sister Dana Rose Mischke, half-brother Anthony Fuentes; and Irma Medina, his godmother and aunt, each testified to a strong relationship between Anthony and his family. Dana said she had a "solid" relationship with Anthony and a "strong" relationship with his children because she saw them frequently and had watched them grow up, although Dana was unable was to give the children's ages when asked, explaining "[t]here's a lot of them." Mr. Fuentes said that he was close to his siblings and that Anthony was the "closest to [him]."

¶ 61    Dana had a "pretty good" relationship with Diego as she had watched him full-time until he was two years old. Irma said she had also spent time with Diego and that her children and Diego were "always together laughing or playing games."

¶ 62    Dana estimated that she and Anthony had approximately 30 cousins living in the Chicagoland area, in addition to aunts and uncles, and that the family got together often, especially in the summer. Irma described the family as "close-knit" and said that if a week passed without them getting together, someone would suggest a get-together. Irma also testified that she could not estimate how many nieces and nephews she had in the Chicagoland area because there were "so many." Mr. Fuentes said that there were "[p]robably seven, eight, ten" other family members in the Chicagoland area, and that "[t]here[ were] times [they had] gotten together," gone to the park

with the kids, or celebrated birthdays.

¶ 63    Dana said that, from her observations, Anthony's four children loved each other and "love[d] spending time together. They just have a lot of love for one another." Dana also said that Anthony loved and "genuinely like[d] to spend time with" his children. Mr. Fuentes said he saw Anthony's four children together "[a]ll of the time" and that they were "very close" and loved each other.

¶ 64    Dana said that there was not much communication between her and Vanessa but that it was not a bad relationship. If Vanessa called, Dana would answer, and Dana would be willing to watch Diego for Vanessa if Vanessa asked. Because Vanessa was the mother of Dana's nephew, she considered Vanessa to be an extension of the family. Dana said she would "[o]f course" be willing to pick Diego up from school if there was an emergency, and his school was in her neighborhood. Irma bore no ill will toward Vanessa and had told Vanessa to call if she needed help. Irma said the lack of communication between them was Vanessa's choice, and Irma had driven in from where she lived in Aurora to pick Diego up from daycare "a couple of times." Mr. Fuentes likewise said that he would be happy to help Vanessa with Diego, and he had offered help previously.

¶ 65    Dana testified that Anthony would feel "incomplete" if Diego moved to Fremont, and it would impact their family and her personally because it was "important to [her] to have strong bonds with the kids." Dana also did not think the relocation would be beneficial to Diego in any way. Irma said that Anthony "always made sure the kids and his wife are always first" and that he and his children were "always together, never apart." Irma believed that Diego would have a tough time not seeing his dad and siblings. Mr. Fuentes also described Anthony as "a great dad" and said he put his children first above all else. Mr. Fuentes said that the whole family would be affected if Diego relocated: "It would be pretty sad" because the relationships would not be the same.

¶ 66    Dana testified that she was not aware of Vanessa ever doing anything to alienate Anthony from Diego, saying she "d[idn't] see that happening." Mr. Fuentes similarly said that to his knowledge, Vanessa had not denied Anthony time with Diego and he had no reason to think Vanessa would do so if she and Diego relocated.

¶ 67                              7. Joseph Taconi, the GAL

¶ 68    Joseph Taconi testified that as GAL he was obligated to "do what [wa]s best for the child that [wa]s the subject of the case," to "make recommendations relative to whatever issue present[d] itself," and "to a certain extent, advocate for the child." Mr. Taconi had been a GAL for approximately 36 years. He testified that in this case, he felt it was important to travel to Fremont, to go to the mother's home, and to go to the father's home. Mr. Taconi said he had met with both parents about five or six times each. He made clear that "[n]one of the people in this case [were] bad people."

¶ 69    Mr. Taconi said he had reviewed the relocation statute and the factors for determining what was in the best interests of the child, evaluated the facts in light of those factors, and made his recommendation in favor of granting Vanessa's petition for relocation. Mr. Taconi agreed that having a child live across the country would impact one's ability to be a parent. He also agreed that his recommendation did not include a statistical analysis to show that Fremont was safer than Chicago or any evidence to substantiate that Diego would receive better schooling in Fremont. Mr. Taconi testified that "[t]o [his] knowledge [Vanessa] ha[d] no formal offer of a secure job if she [went] to Fremont, California."

¶ 70    Mr. Taconi testified that "it struck [him] as unusual that [Anthony] would take the position in this case that the removal shouldn't occur when, in fact, the allocation judgment didn't give him the—didn't give him a say-so relative to education and medical treatment." When Mr. Taconi saw

Diego interacting with his siblings at Anthony's house, "they all got along well together," but "it was a bit chaotic because you have four children who are minors running around, *** but the one thing I do recall is that the kids did get along well together." The GAL also said that the fact that Anthony had four children with three women, none of whom he was married to, "show[ed] a bit of a lack of maturity" on Anthony's part. But the GAL believed that Anthony "[a]bsolutely" cared for his children and that Diego had a relationship with his siblings and his father. Mr. Taconi still felt, however, that overall "relocation would be in Diego's best interest." Mr. Taconi did not review any case law, just the statutory language, but said his experience supported his position.

¶ 71    Mr. Taconi acknowledged that he spoke to Jackie but no one else in Anthony's extended family. Mr. Taconi also said that he was "surprised" at the number of people that came to court to testify on Anthony's behalf, which he viewed as "positive." Mr. Taconi maintained his opinion that although Diego's relationship with Anthony would be impacted if relocation was permitted, it would not be impacted severely "because steps [could] be taken to give [Anthony] the same amount, if not more, of parenting time."

¶ 72    In Fremont, Mr. Taconi was picked up from the airport by Vanessa's parents and testified that the neighborhood was "well-kept" and "neat." He saw the house, then he was driven to the school and received information about the Fremont school system and the specific school Diego would attend. Mr. Taconi did not meet with any administrative personnel from the school.

¶ 73    Mr. Taconi testified that he did not go to Pritzker personally, though he passes by it often. Nor, given Diego's young age, did Mr. Taconi ask Diego where he wanted to live. Mr. Taconi said he had determined, after he wrote the report, that if relocation were allowed Anthony should be given eight weeks, rather than seven of time with Diego in Chicago in the summer. He had also looked at a calendar and realized that Diego could go to Chicago for one weekend per month

during the school year during the six or seven months that there was a holiday on a Friday or a Monday. Mr. Taconi did not believe Chicago was a safe place to raise a child and was not impressed with Vanessa's or Anthony's neighborhood in Chicago, describing them both as "crime-ridden."

¶ 74 Mr. Taconi testified that Diego seemed to be more bonded with and dependent on Vanessa than Anthony. Mr. Taconi also testified that he did not take the impact on Diego's relationship with his siblings into account "because [he] didn't know and [he] did not meet the siblings other than just being made aware of the fact that [Anthony] has four children with different mothers." But Mr. Taconi testified that the relationship with Diego's siblings would be impacted similarly to how his relationship with Anthony would be impacted.

¶ 75 When asked by Anthony's lawyer at the end of his testimony, "[i]n candor, Mr. Taconi, is it still your opinion that [Vanessa] has met her burden," Mr. Taconi responded, "[b]arely." Mr. Taconi explained that the reason he gave that answer was, "if I was handling the case as her advocate, I would have done certain things prior to and up until today's date, but that's an individual attorney's outlook on how he or she handles the specific case."

¶ 76 D. The Trial Court's Denial of the Petition to Relocate

¶ 77 The trial court entered its judgment denying Vanessa's petition to relocate Diego on January 23, 2020. In it, the court found that pursuant to the parenting plan, Anthony had time with Diego on Monday, Tuesday, Thursday, and Friday of each week, which the court deemed "substantial." The court then listed and considered each of the factors in section 609.2(g) of the Act. The court found that "[n]otwithstanding the lack of the evidence indicating that relocation would enhance [Vanessa's] opportunities," certain factors did weigh in favor of relocation. The court noted that Vanessa's parents clearly loved Vanessa and Diego and wanted what was best for

them both. The court had no doubt that Diego would be provided with "a stable and loving living environment in Fremont." The court felt, however, that Anthony's objections weighed "strongly against relocation." It noted that Anthony's relationship with his children was "very important to him," he scheduled his life around them, and Diego regularly spent time with his three half-siblings. The court found that the next factor was neutral, as both parents loved Diego and were actively involved in his life. Because it was not provided with an evidentiary basis to find that educational opportunities weighed in favor of relocation, the court found this factor was neutral.

¶ 78    As to the presence or absence of extended family, the court noted that Diego had a lot of family in Chicago—Anthony estimated there were more than 50 extended family members in the area. The court also observed that Diego's close relationship with his siblings had been "stressed by several witnesses at trial." The court found this factor weighed against relocation because while the court "recognize[d] the benefits of [Diego] spending more time with his maternal grandparents and [Vanessa's] other family in Fremont, *** those benefits [were] counter balanced by the close relationship [Diego had] with his half-siblings and numerous family members he interact[ed] with regularly and frequently in Chicago."

¶ 79    In finding that the anticipated impact of relocation on the child weighed against relocation, the court noted that Anthony had "historically exercised parenting time with Diego four days per week *excluding* overnights" (emphasis in original), and that such regular and frequent parenting time would be diminished if relocation were granted. The court cited the fact that the GAL had testified that Vanessa "barely" met her burden to show that relocation was in Diego's best interests.

¶ 80    The court found that its ability to fashion a reasonable allocation of parenting responsibilities, possible arrangements for the exercise of parenting time appropriate for the parents' resources and circumstances, and the minimization of the impairment to the parent-child

relationship weighed against relocation.

¶ 81    The court noted that Diego was not consulted on his wishes. Finally, the trial court concluded that any other factors were neutral. Specifically, the court rejected the GAL's conclusion that Diego's quality of life would be improved by the move and noted that the GAL's concern that the parents lived in high-crime areas was not supported by evidence.

¶ 82    The court concluded by stating:

    "[Vanessa] testified credibly that relocation to Fremont would benefit her directly. [Vanessa] argued that she has a tremendous support system in Fremont. [Vanessa] intends to live with her parents in her childhood home and her parents testified that they are willing to provide reliable childcare for [Diego].

    While the court finds that relocation to Fremont would likely enhance [Vanessa's] quality of life, not all of the anticipated enhancements to [Vanessa's] quality of life would necessarily translate into an improvement in [Diego's] quality of life. Much of the testimony in support of [Vanessa's] proposed relocation focused on the support system she has in Fremont. However, by all accounts, [Diego] is thriving in his current environment. No competent evidence was introduced that [Vanessa's] lack of family support in Chicago has negatively affected [Diego's] quality of life.

    Furthermore, while [Diego] would undoubtedly benefit from spending additional time with his maternal grandparents in their loving and stable home, these benefits are outweighed by the benefits [Diego] receives in having a close and healthy relationship with [Anthony], [Diego's] three half-siblings, and his extended paternal family members. Finally, given the regular, frequent, and quality parenting time that [Anthony] currently exercises with [Diego], it is unlikely that the impairment to the relationship which would

be caused by relocation could be minimized."

¶ 83    Finding that Vanessa had not met her burden of showing that relocation would be in Diego's best interests, the court denied her petition.

¶ 84                           E. Vanessa's Motion to Reconsider

¶ 85    On February 26, 2020, Vanessa moved for reconsideration of the court's ruling. She noted that the GAL had found both that Diego had a closer relationship with Vanessa than with Anthony and that the quality of education, neighborhood, and the enhanced employment opportunities for Vanessa supported relocation. Vanessa also pointed out that the GAL had considered Anthony's ability to pay child support to be "questionable" and indeed Anthony was behind on his child support obligations. Vanessa argued that the trial court's denial of her petition was against the manifest weight of the evidence because it failed to consider that Anthony's motivations for having the same parenting time with all of his children was not to facilitate their relationships with one another but "out of convenience *** so that he [could] have a weekend to himself without any of his children." In Vanessa's view, the court had also failed to consider the inconsistency and gaps in financial support provided by Anthony, who had still not made any payments toward his child support arrearage.

¶ 86    Vanessa's motion to reconsider was also based in part on new evidence that Anthony had "purposely misle[d] [Vanessa], the court, and his own counsel." Vanessa stated that her neighborhood school was "underperforming" based on its Illinois report card and that private school for Diego had not been feasible financially. She alleged that Anthony told her Diego would be allowed to enroll at Pritzker, "one of the top public schools in Chicago," under "the 'sibling rule,' which he represented would allow [Diego] entry to the school because [Anthony's] other children already attend the school." Vanessa then quoted the Chicago Public Schools Policy

Manual on the sibling rule, which requires that to be eligible, "the enrolled sibling and the applicant sibling must reside in the same household." Vanessa alleged that Diego did not qualify under this policy because he and his siblings did not reside in the same household. Vanessa stated that when she requested Diego's enrollment application, she discovered that Anthony had listed Anthony's grandmother's home as Diego's residence. Vanessa pointed out that if Anthony had enrolled Diego under the 'sibling rule,' as he had led Vanessa, his counsel, and the GAL, to believe, then it would not have been necessary to supply his grandmother's address as an address within the school's district. Vanessa alleged that Anthony had committed fraud by falsely stating he lived within the Pritzker school boundary, and that Anthony's actions were "willful and wanton in order to give him an unfair advantage and deprive [Vanessa] of the opportunity to exercise her decision-making over education and relocate the minor child to" Fremont.

¶ 87    Vanessa also alleged that Anthony no longer exercised the four days per week of parenting time she had testified he had exercised at trial. He instead saw Diego two days per week plus every other weekend. In addition, Vanessa alleged that Anthony had "conspired with his family to show that they frequently [got] together and support[ed] each other," when in reality the family had only gathered three times in the several months following the trial. In addition, she claimed that Anthony had refused parenting time on one of his recent weekends. Vanessa also said that she had offered to bring Diego to Anthony's before school on her way to work in the mornings to save on before-school care and give Anthony more parenting time, but that he had refused the offer. Vanessa had also asked Anthony to see if his sister Dana—who lived near Pritzker—could pick Diego up after school one day per week to save on aftercare. Vanessa claimed that, despite his claim that he had a multitude of helpful relatives living nearby, Anthony had been unable to find any family member to watch Diego for a few hours after school just one day per week.

¶ 88    Vanessa further alleged that Anthony still did not have a stable residence for Diego since a fire destroyed his house on November 9, 2019. According to Vanessa, Anthony had not informed her about the fire, had exercised parenting time with his children at hotels, secured temporary housing, but had no "clear timeline" for the rebuilding of his home. This new evidence, Vanessa maintained, showed both that Anthony was not a credible witness and that several of the trial court's findings were not supported.

¶ 89    In response, Anthony stated that he "currently reside[d]" in the Pritzker school district, though he acknowledged that Diego did not live with his siblings. Anthony admitted that he had written down his grandmother's address as his own on the school application, but explained that it was the address he used "for his business." Anthony denied that he committed fraud or that he purposely misled anyone about the sibling rule, insisting instead that he had genuinely believed that the sibling rule applied, but that "[d]ue to [Vanessa's] continued delays and objections with enrollment, the sibling rule was not applicable at the time the [p]arties' [*sic*] enrolled [Diego] in school." Anthony also argued that Vanessa "had an opportunity to investigate [Anthony's] beliefs and/or assertions" before the relocation trial but had not done so. "[T]o the best of his recollection," Anthony "believe[d] [Vanessa] signed off on the enrollment application."

¶ 90    Anthony also denied that he had not seen Diego as frequently following the trial, alleged that his family had continued to gather frequently, denied that Vanessa offered to bring him Diego in the mornings and he refused, and denied that Vanessa repeatedly asked him to find someone to pick Diego up from school one day per week and he was unable to.

¶ 91    After hearing argument, on October 14, 2020, the trial court issued an order denying the motion to reconsider. The court did not explain its reasoning in the order or on the record.

¶ 92                                    II. JURISDICTION

¶ 93    Vanessa timely filed her notice of appeal from the trial court's orders denying her petition

to relocate and her motion to reconsider on November 12, 2020. We have jurisdiction pursuant to

Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing

appeals from final judgments entered by the circuit court in civil cases.

¶ 94                                     III. ANALYSIS

¶ 95    On appeal, Vanessa argues that the trial court erred in denying her motion to relocate Diego

to Fremont, California. The overriding consideration on a petition for relocation is the best interests

of the child. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. Our supreme court has made clear

that "a best interests determination cannot be reduced to a simple bright-line test and that a ruling

on the best interests of a child must be made on a case-by-case basis, depending, to a great extent,

upon the circumstances of each case." (Internal quotation marks omitted.) *Id.* "A trial court's

determination of what is in the best interests of the child should not be reversed unless it is clearly

against the manifest weight of the evidence and it appears that a manifest injustice has occurred."

*In re Marriage of Eckert*, 119 Ill. 2d 316, 328 (1988).

¶ 96    When a parent files a petition to relocate with a minor and the other parent objects, a court

considers the factors listed in section 609.2(g) of the Act "in accordance with the child's best

interests." 750 ILCS 5/609.2(g) (West 2018). These factors include:

> "(1) the circumstances and reasons for the intended relocation;
>
> (2) the reasons, if any, why a parent is objecting to the intended relocation;
>
> (3) the history and quality of each parent's relationship with the child and
> specifically whether a parent has substantially failed or refused to exercise the parental
> responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." *Id.*

¶ 97     Prior to the legislature's enactment of section 609.2 in 2016, in 1988, our supreme court listed factors that weigh into a child's best interests, including (1) the likelihood that the move will "enhance[e] the general quality of life for both the custodial parent and the children," (2) "the motives of the custodial parent in seeking the move to determine whether the removal is merely a ruse intended to defeat or frustrate visitation," (3) "the motives of the noncustodial parent in resisting the removal," (4) "the visitation rights of the noncustodial parent," and (5) "whether *** a realistic and reasonable visitation schedule can be reached if the move is allowed." *Eckert*, 119 Ill. 2d at 326-27. No one of the *Eckert* factors is controlling. *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 523 (2003). Rather, they "are to be considered and balanced by the [trial] court in

arriving at a best interests determination, and the weight to be given to each factor will vary according to the facts of the case." (Internal quotation marks omitted.) *Id.*

¶ 98    While this was a difficult case, mostly because Diego has the benefit of two loving and involved parents, we find that, here, the trial court's application of six of the statutory factors—factors five through seven and nine through eleven—was clearly against the manifest weight of the evidence. In addition, the court failed to consider fully that, per the parties' agreement, Vanessa was designated the primary residential parent and that she had sole decision making responsibility on all issues other than extracurricular activities. Because of her role, the enhanced quality of life that she would have in Fremont, and the strong family support that she had there, would directly benefit Diego. On that basis we find that the trial court erred in denying Vanessa's motion and in finding that she failed to show that relocation would be in Diego's best interests.

¶ 99    The trial court's findings that factors seven (whether the court will be able to fashion a reasonable allocation of parental responsibilities between the parents), nine (possible arrangements for the exercise of parental responsibilities), and ten (minimization of the impairment to the parent-child relationship) weighed against relocation were clearly against the manifest weight of the evidence. The court offered little analysis with respect to these factors other than to emphasize that Anthony would lose the frequent and consistent parenting time that he enjoyed. In this respect, we note that the trial court focused on Anthony having "historically exercised" parenting time with Diego "four days per week *excluding* overnights" (emphasis in original). However, the court ignored that when Diego started kindergarten, Anthony did not pick Diego up from school and drop him off at Vanessa on his non-visitation days, Tuesdays and Wednesdays. As was clear in Anthony's testimony and in Vanessa's motion to reconsider, once Diego started school, Anthony no longer saw Diego the four times per week provided for in the allocation judgment but instead

saw Diego twice a week, on Monday evening for several hours and overnight on Thursday. In addition, he was entitled to see him on alternate weekends. More significantly, we believe the trial court overlooked the strong evidence that it *would* be able to fashion a reasonable allocation and arrangement for the exercise of parental responsibilities in a way that minimized the impairment of the relationship between Anthony and Diego.

¶ 100   The GAL was enthusiastically confident that a reasonable allocation of parenting time could be fashioned, proposing a schedule that gave Anthony the majority of the summer and six or seven long weekend visits during the school year. Vanessa testified that Diego would have an iPad to allow him daily communication with Anthony. Vanessa and her parents said both Anthony and Jackie would be welcome to stay at their home in Fremont on visits, and that between summers, and weekends and holidays, she would ensure Anthony had the opportunity for at least the same number of overnights (96 per year) he enjoyed prior to the move. There was no reason to doubt any of this since even Anthony's siblings, Dana and Mr. Fuentes, acknowledged that Vanessa had never done anything to interfere with Diego's relationship with Anthony. Vanessa's father also said he would take Diego to visit Anthony, and both parents said they would do what they could to facilitate Diego's relationship with his father.

¶ 101   Anthony and the trial court both focused on the fact that the visitation schedule would be different than it was when Vanessa lived in Chicago. But as our supreme court has recognized, "[i]n all instances, removal will have some effect on visitation. The pivotal question is whether a reasonable and realistic visitation schedule can be created." *Collingbourne*, 204 Ill. 2d at 532. The evidence here can only lead to the conclusion that a reasonable and realistic visitation schedule could be created, the parental responsibilities, which already placed Vanessa fully in charge of all decisions other than extracurricular activities, could be reasonably allocated, and any impairment

to the relationship between Diego and Anthony would be minimized, weighing in favor of relocation.

¶ 102   The trial court also found that the fifth factor, the presence or absence of extended family, weighed against relocation, but the evidence here was clearly to the contrary when it came to Diego's best interests. The court noted that Vanessa, who had extended family in Fremont, but found this to be outweighed by Anthony's testimony that he had 50 family members in the area and that Diego had relationships with his half-siblings. Vanessa testified that, in taking care of Diego, she had minimal help from Anthony's family. This was supported by Vanessa's parents who testified that they flew in from California to care for Diego when his daycare was closed. In Fremont, Vanessa's retired father would be available to take care of Diego every day, eliminating the need for before- and after-school care. It was undisputed that Vanessa had primary responsibility for Diego and she clearly needed help and support. The evidence was overwhelming that such support was far more available from Vanessa's extended family in Fremont than it was from Anthony's family in Chicago. It was against the manifest weight of this evidence for the trial court to conclude that this factor weighed against relocation.

¶ 103   The trial court's conclusion that the sixth factor, the anticipated impact of relocation on Diego, weighed in favor of denying relocation was also against the manifest weight of the evidence. The trial court ignored the finding of the GAL—who had 36 years of experience and actually observed Diego with his siblings and with each of his parents and considered the relationship Diego had with both Vanessa and Anthony. The GAL concluded that he did "not foresee any substantial adverse impact" on Diego.

¶ 104   Finally, the trial court's determination that any other relevant factors was neutral was against the manifest weight of the evidence because the court largely disregarded the benefits

Diego would receive from the overall improved quality of life in Fremont for Diego and for Vanessa who was the primary residential parent. The trial court concluded that "not all of the anticipated enhancements" would improve Diego's quality of life because "[n]o competent evidence was introduced that [Vanessa's] lack of family support in Chicago has negatively affected [Diego's] quality of life." However, this conclusion is at odds with our supreme court's recognition in *Collingbourne* that the life of a child and his custodial parent are intertwined. The court stated:

> "[I]n conducting a best interests inquiry in the context of a removal petition, a [trial] court must consider the proposed move in terms of likelihood for enhancing the general quality of life for *both* the custodial parent *and* the [child]. (Emphases added.) [Citations.] Indeed, [i]f only the direct benefits that affected children were considered, rarely would a situation arise where removal would be permitted where children were in a good environment with good schools, good parents, and good friends. [Citation.] The vast majority of cases from our appellate court have correctly interpreted our decision in *Eckert* and, in determining the best interests of the child in removal actions, have appropriately considered the potential for the move for increasing the general quality of life for both the custodial parent and the child, including any benefit the child may experience stemming from the parent's life enhancement. [Citations.] It follows that what is in the best interests of the child cannot be considered without assessing the best interests of the other members of the household in which the child resides, most particularly the custodial parent." (Internal quotation marks omitted.) *Id.* at 525-26.

The supreme court in *Collingbourne* also noted that "our society is a mobile one," and it has only become more so since that case was decided in 2003. The court then said:

> "since a court has no power to require the noncustodial parent to remain in Illinois, or to

require members of the extended family to remain in Illinois, some deference is due to the custodial parent who has already determined the best interests of her child [ ] *and* herself are served by remarriage and removal. The best interests of children cannot be fully understood without also considering the best interests of the custodial parent." (Emphasis in original and internal quotation marks omitted.) *Id.* at 528.

¶ 105   Like the mother in *Collingbourne*, Vanessa has largely "had to deal with all the day-to-day issues a single parent must face, including the child's physical and emotional well-being, the child's school performance, and the care of the child when he is not in school and [she] cannot be with him." *Id.* at 426-27. Unlike the mother in *Collingbourne*, Vanessa is relocating to live with her parents, not with a new spouse, but the important point is that she is relocating to where she will have a strong support system and constant help with Diego.

¶ 106   We find guidance and further support for our determination from this court's decision in *Ford v. Marteness*, 368 Ill. App. 3d (2006). In *Ford*, the appellate court reversed the trial court's denial of the mother's petition to remove the minor child to Colorado. *Id.* at 176. In doing so, this court found that the trial court "understated" the "prospects for enhancements" to the child's life. *Id.* at 177. The court observed that "the child w[ould] experience benefits with the increase in his mother's quality of life," including economic security and living with the mother's husband who had been active in the child's life. Similarly, here, Vanessa's move to Fremont would increase her and Diego's economic security as they would be living with her parents until she was settled rather than in an apartment with her friend, and Diego would be spending time with his grandparents who have helped care for him instead of going to before- and after-school care three to five days per week.

¶ 107   Our conclusion is strengthened by Vanessa's motion for reconsideration which the court

appears to have denied without an evidentiary hearing. Anthony did not dispute, as Vanessa claimed in her motion, that the sibling rule did not actually allow Diego to attend Pritzker and that his admission is at risk if that is discovered. If Diego were to lose the right to attend Pritzker, obviously the contrast in educational opportunities for him in Fremont and in Chicago would be vast. This risk, which the trial court never acknowledged, confirms our conclusion that the move was in Diego's best interests. Moreover, in that motion and in her emergency motion to suspend overnights which she incorporated by reference, Vanessa alleged that Anthony moved out of his home because of a fire without communicating with her. Moreover, as Vanessa made clear in that motion to reconsider, Anthony still owes her retroactive child support. This confirms Vanessa's testimony that Diego is in need of support from her family in order to achieve the stability that she is clearly struggling to give him. All of this confirms that the denial of the motion was not in Diego's best interests.

¶ 108                                    IV. CONCLUSION

¶ 109    As we recognized in *Ford*, "[r]emoval cases are difficult. This is especially so when neither parent demonstrates bad faith," and that "[n]o matter the outcome, one party's life will likely be affected detrimentally." *Id.* at 176, 180. We do not make our decision in this case lightly. But considering all the evidence, we find the trial court's denial of Vanessa's petition to relocate Diego to Fremont, California, was against the manifest weight of the evidence. Accordingly, we reverse that decision and remand to the trial court for further proceedings, including the fashioning of a parenting schedule consistent with this order and the GAL's recommendations.

¶ 110    Reversed and remanded.